BILLIE IRENE NOLAN, Special Adm'x of the Estate of EDWIN L. NOLAN, JR., Deceased, Plaintiff-Appellant, *v.* JOHNS-MANVILLE ASBESTOS AND MAGNESIA MATERIALS COMPANY *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 77-724

Opinion filed July 24, 1979.

William J. Harte, Ltd., of Chicago (William J. Harte and John J. Lowrey, of counsel), for appellant.

Jacobs, Williams and Montgomery, Ltd., of Chicago (Lloyd E. Williams, Jr., Barry L. Kroll, and David A. Novoselsky, of counsel), for appellee Ryder Industries, Inc.

Baker and McKenzie, of Chicago (Francis D. Morrissey, Harry J. O'Kane, and Daniel J. Cheely, of counsel), for appellees Forty-Eight Insulation, Inc., Minnesota Mining and Manufacturing Co., Pittsburgh Corning Corp., C and E Refractors, Fibreboard Corporation, The Childers Products, Co., and Pabco Products, Inc.

Hinshaw, Culbertson, Moelmann, Hoban and Fuller, of Chicago (Thomas J. Weithers, Stanley J. Davidson, and Frederick S. Mueller, of counsel), for appellee Owens-Corning Fiberglas Corporation.

Clausen, Miller, Gorman, Caffery and Witous, P. C., of Chicago (James T. Ferrini, of counsel), for appellee H. A. Jones.

O'Brien, Redding and Hyde, of Chicago (Donald J. O'Brien, Jr., and Michael W. Rathsack, of counsel), for appellee Standard Asbestos Manufacturing and Insulating Company.

Wildman, Harrold, Allen and Dixon, of Chicago (Ann C. Peterson, of counsel), for appellees Certain-Teed St. Gobain Insulation Corp. and Grant Wilson.

Johnson, Cusack and Bell, of Chicago (William V. Johnson and Thomas H. Fegan, of counsel), for appellees Johns-Mansville and Midwest Pipe Covering.

Ash, Anos, Harris and Freedman, of Chicago (George J. Anos, Bruce T. Logan, and Lawrence M. Freedman, of counsel), for appellees Keene Ceiling and Insulating, Keene Industrial Insulation, Baldwin, Ehret, Hill Inc., and PPG Industries, Inc.

Sloan and Connelly, P. C., of Chicago (Michael P. Connelly, of counsel), for appellee Philip Carey Corporation.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff appeals from an order entered by the circuit court of Cook County on February 8, 1977, granting summary judgment to all defendants, predicated upon decedent's cause of action being barred by the two-year personal injury statute of limitations (Ill. Rev. Stat. 1977, ch. 83, par. 15). The summary judgment was based upon the court's consideration of pleadings, deposition testimony, exhibits, briefs and oral argument of counsel. The principal issues presented on appeal are whether plaintiff has properly pleaded and is entitled to application of the discovery rule under the circumstances of this case, and, if so, whether there are genuine issues of material fact relating to such application, or

not. Edwin L. Nolan, Jr. (hereinafter "Nolan") died during the pendency of the appeal; his wife has been substituted as special administratrix to prosecute the appeal as plaintiff.

For the reasons hereinafter set forth, we reverse and remand.

Defendants named in the lawsuit were alleged to have manufactured, distributed and sold defective asbestos and fiberglass products, with which Nolan worked, and to have failed to warn of dangers inherent in the products. Nolan testified in his deposition that he had been employed as an asbestos insulator from sometime in 1941 until May 1973. His work required him to apply asbestos and fiberglass pipe coverings for the purpose of insulating hot and cold heating ducts. The types of products with which he worked included asbestos cements, 85 percent magnesia pipe coverings, calcium silicates and other materials in which asbestos was used as a binder.

In 1957 Nolan began experiencing a generalized weakness throughout his body, shortness of breath and a little more difficulty in climbing stairs and carrying heavy equipment and materials while working. Some of his co-workers were also beginning to similarly complain. With respect to his knowledge of the dangers inherent in using asbestos, the following questions were asked and answered during the course of Nolan's deposition:

"MR. BELL: Q. When was the first time you were aware of any danger from the use or contact with asbestos products?

MR. NOLAN: A. I couldn't say exactly. I wouldn't really know that.

 * * *

A. I wouldn't really know that because we were never informed when we worked on these jobs. Nobody ever told us that there was any danger to it.

Q. There must have been some point in time when you became * * * aware of the danger of asbestos products?

A. I'd say in the late Fifties probably.

Q. Late Fifties?

A. That's when I started thinking about it, yes.

Q. Is there some year that you could pinpoint in the late Fifties?

A. Well, maybe 1957 probably because that's when I got my first chest x-ray.

Q. 1957. And could you give us the facts surrounding your awareness at that point in time of possible dangers from the use of asbestos?

A. Well, yes. A lot of people I worked with were beginning to complain and I also had a problem. I was beginning to get short of

breath and I didn't know why and the stairs started to get a little harder to climb."

Further in the deposition the following exchange took place:

"Q. I previously asked you when you first became aware of the relationship between asbestos and health problems and you indicated in 1957. Can you explain to me how you became aware of the relationship at that point in time?

A. Well, I started thinking about what was happening to me and I started thinking maybe it was the materials I was working with."

Because of his symptoms, in 1957 Nolan had X rays taken at a mobile unit of the Suburban Tuberculosis Sanitarium in Hinsdale, Illinois. A card in the mail from them stated that he did not have tuberculosis but that "there were problems in the lung" he should have looked into without identifying what those problems were. He saw his family physician, Dr. Robert J. Muench, who examined him and told him that he did have "lung problems," but did not say what they were. Dr. Muench referred him to Dr. Monty Meldmann, a psychiatrist, who gave Nolan a physical examination and had X rays taken. Dr. Meldmann told him "that I did have a lung problem but the complaints I was making wasn't—they weren't strong enough. He thought that my problem was partly mental, also."

According to his testimony, Nolan had no further contact with any doctor or hospital concerning his lungs until 1965, when he again contacted Dr. Muench, advising him that his earlier complaints were becoming more pronounced. He was hospitalized in St. Joseph's Hospital, Elgin, for examination and underwent pulmonary function tests and chest X rays. The specific complaints related by Nolan to Dr. Muench were that Nolan began finding it harder to breathe, to carry heavy loads, to climb stairs and to climb scaffolds. Dr. Muench testified in his deposition that the report with regard to X-ray findings revealed the following: " 'The findings suggest a generalized pulmonary fibrosis or interstitial inflammatory process. Pneumonoconiosis is a consideration to be correlated with the occupation history. Chronic interstitial pneumonia, sarcoidosis, and pulmonary fungus disease are other considerations to be correlated with the clinical and laboratory data. The accentuated findings at the left anterior lower lung field may represent a supraimposed acute inflammation. Comparison to previous chest X rays will be of value.' " The cause of the pulmonary fibrosis was undetermined. Pulmonary function tests were ordered, results showing two satisfactory vital capacities and a third one lower.

According to Nolan, after his examination, he was made aware that he had pulmonary fibrosis, but asbestosis was never mentioned to him

then. He did not ask what pulmonary fibrosis meant. Dr. Muench advised him that there was nothing he could do for him, nor did he indicate any causal connection between Nolan's job as an asbestos worker and the condition of his lungs; however, he had a strong suspicion that his physical condition and his contact with asbestos and fibrous products were related, after he had taken the X rays. When he was discharged from St. Joseph's Hospital, his condition was diagnosed as "Syncopal vertigo of undetermined origin, probably functional." No diagnosis was made as to pulmonary pathology that might have been present.

When Nolan came out of the hospital, he was dissatisfied with what he had been told by Dr. Muench. He went to the Veterans Administration Hospital where he sought another opinion, but was refused admittance, being told by the interviewing VA doctor after a telephone call to Dr. Muench that he was in good hands. From 1965 to May of 1973 Nolan saw no doctor and entered no hospital or other institution concerning his lungs. According to his wife, who was also deposed, he didn't cough and had no sudden change of condition in that period of time, although his complaints continued and became worse.

In 1968 Nolan's trade union began to publish a quarterly magazine called "The Asbestos Worker." In its "green sheets" were printed the results of tests conducted by Dr. Irving J. Selikoff of Mt. Sinai Hospital that purported to establish a relationship between asbestos and lung problems. Nolan testified that the publication of Dr. Selikoff's articles made him more aware of the relationship between asbestos and pulmonary conditions, although he was not familiar with the technical terminology used. No symptoms were described in the "green sheets" which would help him determine whether he was one of those suffering from the lung diseases mentioned.

In May of 1973, he began spitting up blood and had a serious case of diarrhea, which prompted him to see the Arlington Medical Associates. Nolan was examined there by Dr. Robert C. Kloempken, a specialist in internal medicine, the first visit taking place on May 15, 1973. According to Dr. Kloempken's deposition testimony, Nolan complained of diarrhea of two weeks duration, a weight loss of thirteen pounds, shortness of breath, discomfort in his abdomen and swelling of his feet. Upon his advice, Nolan was hospitalized at Northwest Community Hospital. Dr. Kloempken noted as his past history that "* * * [h]e had * * * worked as an asbestos worker from 1941 until the present. He usually worked with fibers as a pipe coverer or insulator. And he still worked with asbestos occasionally. He was told around 1957 that he had *pulmonary fibrosis secondary to asbestosis.*" (Emphasis added.) The emphasized language was repeated in several other medical records in varying forms.

The history taken from Nolan, Dr. Kloempken testified, included the

phrases "pulmonary fibrosis secondary to asbestosis," and "pulmonary fibrosis secondary to this condition," which were professional medical terminology. He did not know whether the nomenclature used was his own language or that of the patient in describing his past history. (Nolan denied ever having stated that he was told he was suffering from asbestosis at any time before May of 1973.) Concerning the language, the following colloquy took place:

"MR. O'BRIEN: Q. In this history in particular, and it has been quoted a number of times, I quote, 'He was told around 1957 that he had pulmonary fibrosis secondary to asbestosis.' That was what was told to you. This has been asked, but then awhile ago you said you are not sure in regards to that terminology.

DR. KLOEMPKEN: A. I am not sure if he used those words. This history is not his words, they are my words. I am paraphrasing what he said.

Q. That is what I am not sure about. Doctor, when I read your history, your history states, 'he was told around 1957 that he had pulmonary fibrosis secondary to asbestosis.'

A. That's correct. Now, whether those are his words or my words, I can't tell you. I would say the entire history. When I take a history, I ask certain questions and I write them down. Sometimes it is shorthand, and I will dictate from there. These are not verbatim like you have a secretary take them down.

Q. I realize he is a layman, but what then could he have possibly told you for you to reach that conclusion in your history? Did he have lung trouble, and did you then conclude that and make it up?

A. He might have said he had lung trouble and chronic lung trouble, and he worked in an asbestos place, and it was bothering him. I don't know really. I really can't honestly tell you that these are the patient's identical words. Maybe as you say, he said he had lung trouble and was working in an asbestos plant, and I said that—I don't know."

During the 3½ week 1973 hospitalization, chest X rays, tuberculosis tests and a lung biopsy were taken. In discussing the results, Dr. Kloempken testified that the chest X ray showed increased markings on the right lower lung, such as pneumonia might cause, which was not characteristic of asbestosis, and there was a question of sarcoid disease of the lung. Because of an ongoing fever, a lung biopsy was performed by a chest surgeon, Dr. Vajra Shreeram. The needle biopsy pathology report revealed the presence in the right lung of fragments of granulation tissue one of which was said to "* * * resemble, morphologically, this so called asbestos body. Clinical correlation, including occupation, is recommended." The microscopic description stated that " '[t]he section

revealed small fragments of fibroconnective tissue showing an extensive area of granulation. The inflammatory cells are chiefly polys, arranged in sheets. In the midst of this tissue are structures resembling asbestos bodies.' "

Dr. Kloempken agreed that prior to the needle biopsy pathology report of May 31, 1973, prepared by Dr. Shreeram, no definite diagnosis of asbestosis had been established. The doctors presumed that Nolan had the disease from his history and their clinical findings. Their presumption was confirmed with the pathology report. A patient can have asbestos bodies within his lungs without being aware of them and it may take from 10 to 25 years before symptoms manifest themselves. Nolan had developed a heart condition which was probably secondary to increased scarring of the lungs, known as pulmonary fibrosis, which was secondary to asbestosis. This was exacerbated by tuberculosis, which was also found to be present.

Dr. Kloempken could not state that the condition he found in Nolan in 1973 was consistent with a history of pulmonary fibrosis dating back as far as 1957 because he did not see much asbestosis and didn't have enough experience in that regard; it might have been possible. A previous diagnosis of pulmonary fibrosis would be consistent with asbestosis and "* * * with many other things * * *. A heavy smoker can have fibrosis of the lung. That's a very common diagnosis." Nolan had told him that he smoked over one package of cigarettes per day. The discharge summary indicated that Nolan had been progressively short of breath, but there was no documentation of how long that condition continued until it had become worse. He didn't know how long Nolan had asbestosis or how long he was symptomatic from that disease. "It was probably recently." The symptoms to which he was referring were shortness of breath, swollen ankles and liver enlargement.

Nolan testified that following the 1973 tests, Dr. Kloempken informed him that he had asbestosis as well as tuberculosis, the latter of which had been causing his fever. He was placed in the Hinsdale Tuberculosis Sanitarium on June 8, 1973, where he was given various medicines and was under oxygen most of the time.

In a letter from Nolan to a union representative dated June 23, 1973, after the lung biopsy had been performed, he wrote that he "[h]ad a lung biopsy that shows scar tissue & asbestos fibers * * * something that has been known for years but something I had learned to live with till Friday May 11 (the last day I worked) * * *." (In his deposition, Nolan tried to explain that the "something that has been known" was that he had been working with asbestos fibers.)

Catherine V. LeBlang, a public health nurse, testified that she interviewed Nolan and his wife in 1973 because of Nolan's condition of

tuberculosis. She reported that Mrs. Nolan, when interviewed alone while Nolan was still hospitalized, indicated her husband had been diagnosed in 1957 as having lung fibrosis from asbestos. (Mrs. Nolan denied having been told that and denied having made that statement to the nurse.) LeBlang's typewritten report was copied from a longhand report, which she in turn composed from notes taken during the course of the interview. The choice of terminology in her report was her own. She could not recall the words that Mrs. Nolan had actually used when discussing the matter with her.

The complaint was filed on May 9, 1975. It alleges that defendants: manufactured, distributed and sold defective asbestos and fiberglass which were unreasonably dangerous because the containers were not adequately labeled so as to warn plaintiff of foreseeable and known dangers; failed to warn of the likelihood of contracting asbestosis due to prolonged exposure to and use of fiberglass and asbestos; and failed to provide protective equipment in order to eliminate plaintiff's exposure to dust created when installing asbestos and fiberglass. The complaint alleged further that Nolan became totally disabled and was unable to continue working as of May 11, 1973, and that he did not know, nor should he have known, of the relationship between the inhalation of the dust and pulmonary asbestosis until he had to stop working.

I.

A threshold contention made by certain defendants is that the allegations of plaintiff's complaint, particularly those which relate to Nolan's lack of actual or inferential knowledge of his injuries, do not permit this case to be brought within the scope of the discovery rule because specific facts are not pleaded as to why discovery of the cause of action could not have occurred sooner, citing *Auster v. Keck* (1976), 63 Ill. 2d 485, 349 N.E.2d 20; *Kielminski v. St. Anthony's Hospital* (1979), 68 Ill. App. 3d 407, 386 N.E.2d 326; and *Chicago Park District v. Kenroy, Inc.* (1978), 58 Ill. App. 3d 879, 374 N.E.2d 670. Each of the foregoing authorities are distinguishable, however. In *Auster*, the motion to dismiss amended count II of the complaint there under consideration was sustained because of the complete silence within that count concerning any knowledge that the prior owners may have had as to the defective condition of property for which the plaintiffs there sought damages. In *Kielminski*, the plaintiff made no allegation as to when she knew or reasonably could have known of the malpractice there alleged, for which reason the motion to dismiss was sustained. In *Kenroy*, the court held that the plaintiff there had the unfulfilled burden of alleging that it neither knew nor could have known of the facts supporting its cause of action, which plaintiff in the present case has attempted to do.

■■ Although the instant complaint does not typify model pleading, it has reasonably informed defendants of the nature of the claim which they were called upon to meet (Ill. Rev. Stat. 1977, ch. 110, par. 42(2)).The complaint has been answered by defendants, generally denying the allegations therein set forth. In having proceeded to summary judgment defendants have, in effect, conceded that a cause of action has been stated. (See, *e.g., Janes v. First Federal Savings & Loan Association* (1974), 57 Ill. 2d 398, 406, 312 N.E.2d 605.) Such objections to the pleadings as defendants now pursue should have been raised in a motion under section 45 of the Civil Practice Act, specifically identifying the defect complained of, so that an effort could have been made to amend in the motion court (Ill. Rev. Stat. 1977, ch. 110, par. 45).

## II.

Plaintiff maintains that she is entitled to apply the discovery rule relative to the statute of limitations as it has developed in Illinois, relying upon *Rozny v. Marnul* (1969), 43 Ill. 2d 54, 250 N.E.2d 656; *Lipsey v. Michael Reese Hospital* (1970), 46 Ill. 2d 32, 262 N.E.2d 450; *Society of Mount Carmel v. Fox* (1975), 31 Ill. App. 3d 1060, 335 N.E.2d 588; *Wigginton v. Reichold Chemicals, Inc.* (1971), 133 Ill. App. 2d 776, 274 N.E.2d 118; *McDonald v. Reichold Chemicals, Inc.* (1971), 133 Ill. App. 2d 780, 274 N.E.2d 121; *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.* (1975), 61 Ill. 2d 129, 334 N.E.2d 160; *E. J. Korvette v. Esko Roofing Co.* (1976), 38 Ill. App. 3d 905, 350 N.E.2d 10; *Roper v. Markle* (1978), 59 Ill. App. 3d 706, 375 N.E.2d 934; and *Kristina v. St. James Hospital* (1978), 63 Ill. App. 3d 810, 380 N.E.2d 816. Defendants argue to the contrary.

The development and application of the "discovery rule" in Illinois with respect to the tolling of tort statutes of limitations have been ably traced, studiously analyzed and thoroughly considered in a number of decisions, one of the most recent being *Kristina v. St. James Hosp.* A brief advertence to the opinion in that case will be helpful in our consideration (63 Ill. App. 3d 810, 812-13):

> "We have examined the cases presented by the parties. In our opinion, the reasoning in *Roper v. Markle* (1978), 59 Ill. App. 3d 706, 375 N.E.2d 934, is persuasive. That case presents a thorough review of the decisions in this State on this issue. (See also *The Evolution of Illinois Tort Statutes of Limitation: Where are We Going and Why?*, 53 Chi.-Kent L. Rev. 673 (1977).) The court in *Roper* concluded that the statute of limitations commences when the injured party discovers or should reasonably have discovered not only the nature of the affliction but also that it was wrongfully caused.

We find support for this conclusion in *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.* (1975), 61 Ill. 2d 129, 334 N.E.2d 160. There the supreme court cited with approval *Kohler v. Woollen, Brown & Hawkins* (1973), 15 Ill. App. 3d 455, 304 N.E.2d 677 and *Wigginton v. Reichold Chemicals, Inc.* (1971), 133 Ill. App. 2d 776, 274 N.E.2d 118, both of which held that the limitation period commences when the injured party discovers or should have discovered that he was injured by the defendant's conduct. *Tom Olesker's*, 61 Ill. 2d 129, 135."

■■ Defendants assert that the discovery rule should be utilized only in those cases involving a single, well-documented event, rather than an injury which develops over a long period of time. They cite the medical malpractice cases as an example of appropriate implementation of the rule. Further analysis demonstrates the injustice of such a limited application. In *Roper v. Markle* (1978), 59 Ill. App. 3d 706, 375 N.E.2d 934, the court undertook the harmonization of various authorities concerned with this problem based upon the nature of the injury sustained by the various parties seeking relief from the mechanical application of statutes of limitations. These included traumatic injury cases, where the damage is caused by external violence; foreign substance cases, where the plaintiff discovers the substance left behind; and nontrauma cases, where the injury involved is of such a nature that the subject is not immediately aware of its origination by negligent means. Nontrauma cases were found to include respiratory illnesses of which plaintiffs complained in *Wigginton* and *McDonald*. In *Wigginton* the court stated the applicable rule to be (133 Ill. App. 2d 776, 779-80):

> "In cases involving a disease resulting from neglect, negligence or a defective product we believe that the more logical and tenable position is that the cause of action accrues and statute of limitation begins to run when the diseased party discovered or should have discovered that he is ill as the result of some neglect or negligence on the part of another party or as the result of being wrongfully exposed to a defective product. See *Urie v. Thompson*, 337 U.S. 163, 69 S. Ct. 1018, 11 A.L.R.2d 252; *Sylvania Electric Products, Inc. v. Barker*, 228 F.2d 842; *Brush Beryllium Co. v. Meckley*, 284 F.2d 797."

The *Roper* analysis has been followed in two very recent cases decided after *Kristina*, which itself adopted *Roper*: *Martinez v. Rosenzweig* (1979), 70 Ill. App. 3d 155, 387 N.E.2d 1263 and *Licka v. William A. Sales, Ltd.* (1979), 70 Ill. App. 3d 929, 388 N.E.2d 1261.

In identifying that time when a plaintiff knew or should have known of the injury sustained by reason of the negligence on the part of another party or of wrongful exposure to a defective product, the issue may be

better understood when considered in a somewhat different context, the industrial disease cases. In *Madison v. Wedron Silica Co.* (1933), 352 Ill. 60, 184 N.E. 901, an action for willful violation of the Occupational Disease Act and " '[a]n act in relation to employments creating poisonous fumes or dust in harmful quantities,' " was considered by our supreme court. There the defendant contended that the statute of limitations barred recovery upon the theory that the first inhalation or breach of duty was the damage and required the commencement of an action for damages within two years thereafter. In dismissing that statute of limitations argument, the supreme court said (352 Ill. 60, 61-62):

> "This court has recognized that an occupational disease is of slow development; an insidious illness that creeps unnoticed upon its victim. (*Peru Plow Co. v. Industrial Com.*, 311 Ill. 216, and cases cited.) * * * To say that the plaintiff must have filed suit at the time of the first inhalation of the silica dust, means that an injury could not, as a matter of fact, be proved. Such argument is unsound and does violence to the manifest intent of the legislature as expressed in the act and its amendments. The logical view is to consider the time when the employee is forced to quit work because of the cumulative effect of successive injuries resulting in final disablement rather than the first inhalation or injury."

We are thoroughly cognizant of the distinctions between the present case and an occupational disease case seeking statutory compensation such as *Madison*; however, the analysis drawn by the supreme court is useful in a case such as this, where the disease of asbestosis, according to expert testimony, can develop over a period of 10 to 25 years, even though the action pursued here is for products liability rather than workmen's compensation. It should be noted that the *Madison* analysis has found currency in another strict tort liability setting, *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305, and in a personal injury negligence action, *Renslow v. Mennonite Hospital* (1977), 67 Ill. 2d 348, 365, 367 N.E.2d 1250 (concurring opinion by Mr. Justice Dooley).

From the foregoing Illinois authorities it is clear that the statute of limitations in a case such as this, involving a physical condition characteristically developing slowly and insidiously over a long *period* of time, rather than at a specific *point* in time, necessitates more than a mere computation or accrual of calendar days. Requiring the filing of a lawsuit before the potentially serious consequences of exposure to a dangerous and defective product can possibly be known or become known for a period perhaps of from 10 to 25 years, could destroy a just and meaningful claim for injuries simply for want of knowledge or proof and thereby nullify any realistic redress available to an injured party.

Defendants argue that application of the discovery rule to these facts would disregard, if not destroy, the equitable nature of the rule which requires a balancing between plaintiff's right to proceed and defendant's right to know of the claim and to prepare appropriate defenses, relying upon *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.,* and *Praznik v. Sport Aero, Inc.* (1976), 42 Ill. App. 3d 330, 355 N.E.2d 686. They claim that in such a balancing of equities, defendants must prevail, citing the fact that 37 years have passed since Nolan first began employment in the asbestos industry which has eliminated many records concerning distribution of products and dulled memories of employees making it impossible to reconstruct events, a situation now compounded by Nolan's death. The balancing test stated in *Olesker's* and *Praznik* ineluctably applies in a case such as this; however, it does not assure the validity of defendants' conclusions. A similar argument was made in *Harig v. Johns-Manville Products Corp.* (1978), 284 Md. 70, 394 A.2d 299. There, the United States District Court for the District of Maryland certified to the Maryland Court of Appeals two questions of law with respect to the application of the Maryland statute of limitations to the facts of an asbestos claim grounded in strict liability. The Maryland Court of Appeals, in utilizing a similar balancing test asserted by defendants there, noted the purposes underlying statutes of limitations which included encouraging promptness in instituting actions, suppressing stale or fraudulent claims, avoiding inconvenience which may stem from delay and fairness to the defendant by providing assurance that no ancient obligations remain which would require it to defend a claim after evidence is lost, memories are faded and witnesses have disappeared (284 Md. 70, ___, 394 A.2d 299, 302). These are the same factors upon which statutes of limitations are founded in Illinois (see, *e.g., Rozny v. Marnul,* and *Olesker's*), as defendants have asserted. The Maryland court stated further, however (284 Md. 70, ___, 394 A.2d 299, 305):

> "Like the victim of undiscoverable malpractice a person incurring disease years after exposure cannot have known of the existence of the tort until some injury manifests itself. In neither case can the tort victim be charged with slumbering on his rights, for there was no notice of the existence of a cause of action. * * * In cases where the initial injury is inherently unknowable, however, the statute of limitations should not begin to run until the plaintiff should reasonably learn of the cause of action. *Developments in the Law,* 63 Harv. L. Rev. at 1207. Avoiding possible injustice in such cases outweighs the desire for repose and administrative expediency, which are the primary underpinnings of the

limitations statute. *Id.* at 1204; Birnbaum, *'First Breath's' Last Gasp: The Discovery Rule in Products Liability Cases,* 13 FORUM 279, 290 (1977)."

To the same effect is *Raymond v. Eli Lilly & Co.* (1977), 117 N.H. 164, 371 A.2d 170, 176-77. The desire for repose and administrative expediency in the present case is outweighed by the possible injustice by virtue of the nature of the injury here involved.

### III.

We next consider when Nolan may be held to have known or when he should have known that he sustained the injury of which he complained so as to activate the statute of limitations under the facts of this case. Here, again, because of the nature of the injury claimed, considerable difficulty attends the determination which must be made. Although we find no asbestosis tort claim adjudicated in Illinois, courts of other jurisdictions have been confronted with such claims; their resolution of the issue will assist in our determination. Considering a fact situation quite similar to that present in the instant case, the United States Court of Appeals in *Karjala v. Johns-Manville Products Corp.* (8th Cir. 1975), 523 F.2d 155, had before it the claim of an installer of asbestos insulation who had been exposed to asbestos dust from 1948 to 1966, when he quit his job. Like Nolan in the instant case, Karjala began to experience a shortness of breath, congestion, loss of appetite and general weakness in 1959 and underwent a chest X ray upon the unconfirmed suspicion that he had contracted tuberculosis. On a later visit to the sanitarium where the X ray was taken, he noticed that his record showed "possible asbestosis." His shortness of breath grew worse throughout the period. In 1963, during the course of treatment for a damaged disc, a tumor was discovered on his right lung and was removed. The shortness of breath nevertheless continued and routine activities such as walking up and down stairs became strenuous for him. After coughing up blood in June 1966, he visited his doctor and examination revealed that he had asbestosis and he was told to quit his job, which he did. He filed his action in 1971 against several manufacturers of asbestos insulation charging that their products were unreasonably dangerous and that they failed to warn him of the products' defective condition. Among the arguments raised by defendants in that case was that Karjala's action was barred by the six-year Minnesota statute of limitations. The court, in holding that this question was one of fact to be decided by the jury, stated (523 F.2d 155, 160-61):

"As in silicosis cases, see *Urie v. Thompson,* 337 U.S. 163, 69 S. Ct. 1018, 93 L. Ed. 1282 (1949), there is rarely a magic moment

when one exposed to asbestos can be said to have contracted asbestosis; the exposure is more in the nature of a continuing tort. It is when the disease manifests itself in a way which supplies some evidence of causal relationship to the manufactured product that the public interest in limiting the time for asserting a claim attaches and the statute of limitations will begin to run. The time at which Karjala's impairment manifested itself was, of course, for the jury to determine."

In another factual setting analogous to that presented in the instant case, a product liability claim involving the scope of an asbestos manufacturer's duty to warn industrial insulation workers of dangers associated with the use of asbestos was studied by the United States Court of Appeals in *Borel v. Fibreboard Paper Products Corp.* (5th Cir. 1973), 493 F.2d 1076. The plaintiff there, Borel, began working in the asbestos industry in 1936 until disabled by asbestosis in 1969. Borel said that he knew he was ingesting asbestos dust and that it "was bad" for him, vexatious and bothersome, but that he never realized that it could cause serious or terminal illness. He and some of his coworkers discussed how bad the dust was, that it could give one "TB," while others were saying that "it dissolves as it hits your lungs. That was the question you get all the time." Borel testified that he was in good health until the mid-1960s, except for pains caused by lung congestion which his doctor attributed to pleurisy. In 1964 a doctor examined Borel and told him that X rays of his lung were cloudy and the cause could be his occupation as an insulation worker, advising him to avoid asbestos dust as much as he possibly could. In January of 1969, Borel was hospitalized and a lung biopsy performed. His condition was diagnosed as pulmonary asbestosis. Borel testified that this was the first time he knew he had asbestosis. In February of 1970 he underwent surgery for removal of his right lung which had developed a form of lung cancer known as mesothelioma, which had been caused by asbestosis. Borel died before the case reached the trial stage. In considering the two-year Texas statute of limitations defense raised in that case, based upon the theory that the cause of action accrued at the time of the injury and that Borel, having been exposed to asbestos dust since 1936, must have contracted asbestosis long before 1969, the year in which the action was filed, the court held (493 F.2d 1076, 1102):

"In cases involving similar injuries resulting from exposure to deleterious substances over a period of time, courts have consistently held that the cause of action does not accrue until the effects of such exposures manifest themselves * * * [Citations.] This principle is analogous to the 'discovery rule' applied in medical malpractice cases, which provides that the cause of action

does not accrue until the injury is discovered or in the exercise of reasonable diligence should have been discovered. * * * [Citations].

Here, Borel testified in his deposition that he did not know that he had asbestosis until surgery was performed on March 7, 1969. No doctor previously examining Borel had diagnosed his condition as asbestosis. Borel filed his action seven months after he was informed of his condition. The trial court determined that the action was filed timely and refused to submit the issue to the jury. Since there is no substantial evidence opposing the court's finding, we conclude that it did not err on this point."

In yet another asbestosis case, *McKee v. Johns Manville Corp.* (1978), 94 Misc. 2d 327, 404 N.Y.S.2d 814, plaintiff McKee claims that he had developed asbestosis as a result of his 30 years of employment as an asbestos insulation installer, proceeding in actions of negligence, strict products liability and breach of warranty. Among the defenses raised by defendants was the expiration of the three-year New York statute of limitations. McKee maintained that his condition was first diagnosed as "asbestosis-pulmonary fibrosis" in the spring of 1973; defendants asserted that according to his medical records he may have suffered from the disease as early as 1968. The summonses were not served until August of 1975. In considering the issue as to when the statute of limitations began to run, the New York court stated (94 Misc. 2d 327, ___, 404 N.Y.S.2d 814, 817):

"The enigmatic question then surfaces as to when did the 'injury' occur. A review of the cases in the area reveals this question to be unanswered by the Courts of this State in its application to 'occupational diseases' actions brought under the theory of strict products liability. Recent decisions in other jurisdictions have generally held that the issue of the Statute of Limitations in such cases is a proper factual matter for the jury or the trier of the facts to decide, and that the date of diagnosis should measure the date the Statute of Limitations begins to run, unless the defendants can show that the plaintiff should, in the exercise of reasonable diligence, have earlier discovered the nature of the disease. * * * [Citations.]"

In the case *sub judice*, because of Nolan's symptoms of shortness of breath and generalized weakness, in addition to his awareness of a possible connection between his work and his health in 1957, prompting him to secure X rays of his lungs, defendants urge that the statute of limitations should be held to have expired sometime in 1959. Alternatively, defendants argue, he must be held to have known, or at the least, should have known that he contracted asbestosis in 1965, causing the

statute of limitations to expire in 1967, or, at the latest, in 1970, for the following reasons: in 1965 Nolan's symptoms became more pronounced; he was then told that he had pulmonary fibrosis and needed a new pair of lungs; he suspected that there was a relationship between his health and the materials with which he worked; and he remained interested and informed, through reading the quarterly magazine published by his union in which Dr. Selikoff wrote in 1968, about medical evidence linking the higher incidences of lung problems in asbestos workers to the use of asbestos-fiber products. Defendants contend that this should be particularly persuasive in light of the history taken by Dr. Kloempken that Nolan had been told in 1957 he had "pulmonary fibrosis secondary to asbestosis," and Nolan's letter to the union representative in June of 1973 that he "[h]ad a lung biopsy that shows scar tissue & asbestos fibers . . . . . something that has been known for years but something I had learned to live with ° ° °."

That all the foregoing constitutes evidence of Nolan's awareness of a lung condition which could have been connected with his exposure to asbestos and fiberglass fibers, if not the contraction of asbestosis itself, cannot be gainsaid; however, contrasted with that is other evidence that in 1957 and 1965 Nolan did indeed diligently seek medical attention but was not diagnosed as having asbestosis. In one instance, his symptoms were thought to be partially mental. The 1965 diagnosis was characterized as an "unspecific inflammatory lung disease," and "syncopal vertigo of undetermined origin." Although he was told that he had lung fibrosis, Nolan testified that no one mentioned asbestosis to him at that time. When he sought a further diagnosis at the VA Hospital, his admittance was denied and he was told that he was already in good hands. Further, it is unclear whether the medical terminology was structured by Dr. Kloempken taking the medical history or by Nolan in reporting it. Nolan denied knowing of such a diagnosis or stating it to his doctor. Dr. Kloempken also said that he could not tell how long Nolan had asbestosis or had been symptomatic, and that the symptoms he deemed significant were probably of recent origin. He attributed pulmonary fibrosis to many other causes, including heavy smoking. Nolan smoked over one package of cigarettes per day. Nolan explains the passage in his letter as meaning he had known of exposure to asbestos fibers for years. Such evidence is countervailing to defendants' thesis that Nolan knew or should have known that he had contracted asbestosis before May of 1973. These conflicting evidentiary matters require that consideration and evaluation of weight to be accorded to each be resolved by a fact-finder.

■ ■ The rules governing summary judgment procedures are well established. Although recognized as a salutary procedure in the

administration of justice, it is a remedy which should be granted with caution so that the respondent's right to a trial, wherein the evidentiary portion of his case may be presented, is not usurped in the presence of material conflicting facts and inferences. The function of this procedure is to determine whether triable issues of fact exist in the record, not to try such issues. The right of the moving party to summary judgment must be clear, free from doubt and determinable solely as a question of law. If there is present any fact or facts on which reasonable persons may disagree, or inferences which may be fairly drawn from those facts and may lead to different conclusions, the motion court must stay its hand and permit the resolution of those facts and inferences to be made at trial. (*Littrell v. The Coats Co.* (1978), 62 Ill. App. 3d 516, 519-20, 379 N.E.2d 293; *Century Display Manufacturing Corp. v. D. R. Wager Construction Co.* (1977), 46 Ill. App. 3d 643, 648, 360 N.E.2d 1346; *Amelco Electric Co. v. Arcole Midwest Corp.* (1976), 40 Ill. App. 3d 118, 351 N.E.2d 349.) With the foregoing rules as frames of reference, it appears that the question of when Nolan knew, or should have known of his injury, is a matter for determination by the trier of fact. To grant summary judgment on this state of the record was error which must be reversed and remanded for consideration by a fact-finder as to when Nolan knew or, in the exercise of reasonable diligence, should have discovered that he had contracted the disease asbestosis due to defendants' acts or omissions which would have entitled him to proceed against them. *Harig v. Johns-Manville Products Corp.*; *Karjala v. Johns-Manville Products Corp.*; *Borel v. Fibreboard Paper Products Corp.*; *McKee v. Johns Manville Corp.* See also *Licka v. William A. Sales, Ltd.*; *Martinez v. Rosenzweig*; *Kristina v. St. James Hosp.*; and *Roper v. Markle.*

Defendants rely on *Ilardi v. Spaccapaniccia* (1977), 53 Ill. App. 3d 933, 369 N.E.2d 144; *O'Bryant v. Starkman* (1977), 53 Ill. App. 3d 991, 369 N.E.2d 215; and *Anguiano v. St. James Hospital* (1977), 51 Ill. App. 3d 229, 366 N.E.2d 930, for the proposition that the facts in the present case may be ruled upon as a matter of law in supporting the summary judgment entered. The facts in each of those cases, however, are distinguishable from the situation in the present case. In *Ilardi*, the plaintiff admitted in her complaint and at oral argument that she learned of her injury shortly after the operation of which she complained over 3½ years prior to the time she brought her action. She had become aware of the subject separation of the webbing between the toes of her feet and the splaying of the toes, together with pain developing in those areas, soon after the questioned operation. Also present there was the doctor's alacritous offer to reoperate when she complained. The court held that the discovery rule could not be invoked under such circumstances. In *O'Bryant*, the plaintiff had sought treatment for an injured knee for which

"they had not done anything" at the defendant hospital, but which required corrective surgery to be performed on the very next day at another hospital, the date upon which the statute was held to have commenced running. In *Anguiano*, the plaintiff was injured in an industrial accident which crushed his pelvic area from which he developed, among other things, recurring strictures of his urethra. He was told by the examining physician in 1968 and again in 1970 to have this urinary problem evaluated by a competent urologist, which advice that plaintiff disregarded for two years. The court there held that the plaintiff reasonably should have known when told for the second time to have his problem evaluated by a competent urologist that he had sustained an actionable injury. Significantly, Anguiano had been aware of his urinary problems since 1967, yet the date chosen as the starting point for the commencement of the statute of limitations, that is, when plaintiff should have known that his problem was caused by the defendant's negligence, was when he was advised in 1970 for the second time to visit a specialist. In the instant case there is evidence that although Nolan sought medical advice in 1957 and 1965, no diagnosis of asbestosis had been established. His physician in 1973 asserted that he did not know for how long Nolan had asbestosis or how long he was symptomatic, but that "[i]t was probably recent[ly]." This testimony contraposes the thesis that Nolan knew or should have known as a matter of law that he had contracted the disease in 1957 or 1965.

Defendants also seek support in *Hayes v. Weyrens* (1973), 15 Ill. App. 3d 365, 304 N.E.2d 502. There, the plaintiff was a nurse not only engaged in the teaching of nursing, but possessed of considerable medical experience, background and skills. She was knowledgeable with regard to prescription drugs. She testified that she had ceased taking the drug of which she complained because she knew that it was causing her illness, a conclusion she reached without equivocation. Such knowledge by one trained in the medical sciences cannot be said to compare as a matter of law with the level of layman's knowledge possessed by Nolan, whose physicians in 1957 and 1965, certain evidence may prove, did not diagnose the disease in those years.

IV.

Defendant Philip Carey adopts the briefs and arguments filed on behalf of the other defendants with respect to the statute of limitations issue, but asserts that it moved to dismiss plaintiff's complaint in the trial court on the ground that plaintiff's claim of proximate causation by that defendant's products of his condition was as a matter of law based upon mere speculation, guess and conjecture; said motion was continued from time to time, and it was finally consolidated for hearing with the motions

▮▮▮▮▮      ▮▮▮▮▮

to dismiss based upon the limitation theories. Philip Carey assigns plaintiff's failure to address herself to this argument either in the trial court or on appeal as an independent basis to sustain the dismissal order as to it, citing *People ex rel. Jendrick v. Allman* (1947), 396 Ill. 35, 71 N.E.2d 44; *Thornberry v. Board of Education* (1972), 8 Ill. App. 3d 351, 290 N.E.2d 360; *Mound City Warehouse Co. v. Illinois Central R.R. Co.* (1964), 51 Ill. App. 2d 103, 200 N.E.2d 919; *Clore v. Fredman* (1974), 59 Ill. 2d 20, 319 N.E.2d 18; and Illinois Supreme Court Rule 341(e)(7) (Ill. Rev. Stat. 1977, ch. 110A, par. 341(e)(7)). The order entered by the trial court from which this appeal was taken, however, specifically states that the summary judgment granted to all defendants was predicated upon decedent's cause of action being barred by the statute of limitations. No other ground was considered in the order. Having stated the basis for its judgment, we are not left to guess or conjecture as to the ground upon which the court was ruling, which distinguishes this case from the foregoing authorities. This will not preclude defendant Philip Carey from pursuing its separate motion after this cause has been returned to the trial court.

For the reasons stated, the judgment of the circuit court is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

STAMOS, P. J., and PERLIN, J., concur.