# R.T. VANDERBILT COMPANY, INC. *v.* HARTFORD ACCIDENT AND INDEMNITY COMPANY ET AL.
## (SC 20000)
## (SC 20001)
## (SC 20003)

Robinson, C. J., and Palmer, D'Auria, Mullins, Kahn and Ecker, Js.

*Syllabus*

The plaintiff, which previously mined and sold industrial talc that allegedly contained asbestos, sought, inter alia, a declaratory judgment to determine, inter alia, its rights and obligations under certain insurance policies issued by the defendant insurance companies as to the costs of defending and indemnifying the plaintiff in numerous civil actions brought against it for personal injuries sustained allegedly as a result of exposure to asbestos. The defendants consisted of approximately thirty insurance companies, including H Co. and C Co., primary insurers that issued certain insurance policies to the plaintiff between 1948 and 2008, when it mined and sold talc, and L Co., M Co., and P Co., secondary insurers that issued umbrella or excess coverage to the plaintiff during that same period. Prior to trial, the court issued certain scheduling orders separating the trial into four phases, the first two of which were tried

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

to the court and focused on issues pertaining to how defense and indemnification costs were to be allocated between the plaintiff and the defendants, specifically with respect to long latency claims alleging that the claimants' exposure to asbestos caused a series of injuries that developed gradually over the course of years, thereby implicating multiple insurance policy periods. The court also considered, inter alia, whether certain pollution and occupational disease exclusions in some of the secondary insurance policies precluded coverage. After the first two phases of the trial were complete, the trial court issued memoranda of decision applying the time on the risk rule of contract law, which provides for pro rata allocation of defense and indemnity costs for asbestos related disease claims, in order to determine how to allocate those costs among the parties. In doing so, the trial court adopted the continuous trigger theory of insurance coverage, pursuant to which every insurer that had issued a policy in effect from the date that a claimant was first exposed to asbestos until the date the claimant manifested an asbestos related disease is potentially liable for defense and indemnity costs. To that end, the trial court precluded the admission of expert testimony regarding the adoption of the trigger theory of liability and medical science about the timing of bodily injury from asbestos related disease. The court also adopted the unavailability of insurance exception to the time on the risk rule, pursuant to which defense and indemnity costs are allocated to the insured for periods of time during which insurance is not available. With respect to the pollution exclusions at issue, the trial court concluded that they were ambiguous as to whether they encompassed claims arising from exposure to asbestos, as opposed to claims strictly involving traditional environmental pollution, and, therefore, that those exclusions did not preclude coverage. As to the occupational disease exclusions contained in two policies issued by L Co. and P Co., the trial court concluded that those exclusions were unambiguous and that they barred coverage only for claims brought by the plaintiff's own employees, not for claims brought by nonemployees who developed occupational diseases while using the plaintiff's talc in the course of working for other employers. Thereafter, the plaintiff and certain defendants were granted permission to file interlocutory appeals with the Appellate Court pursuant to the rules of practice (§ 61-4 [a]). The Appellate Court concluded that the trial court properly adopted, as a matter of law, a continuous trigger theory of coverage for asbestos related disease claims and, accordingly, upheld the preclusion of expert testimony proffered by M Co. on the timing of bodily injury from asbestos related disease. The Appellate Court also upheld the trial court's adoption of an unavailability of insurance exception to the time on the risk rule and agreed with the trial court that the pollution exclusions were ambiguous and did not bar coverage for the underlying claims outside of the context of traditional environmental pollution. With respect to

333 Conn. 343    OCTOBER, 2019    345

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

the occupational disease exclusions, however, the Appellate Court disagreed with the trial court's determination that those exclusions were ambiguous and concluded that those exclusions unambiguously barred coverage for occupational disease claims brought not only by the plaintiff's own employees, but also by nonemployees who developed an occupational disease while using the plaintiff's talc in the course of working for other employers. The Appellate Court reversed in part the judgment of the trial court, and the plaintiff and certain defendants, on the granting of certification, filed separate appeals with this court. *Held*:

1. The Appellate Court properly upheld the decision of the trial court to adopt a continuous trigger theory of coverage for asbestos related disease claims and an unavailability of insurance exception to the time on the risk rule of contract law, and to preclude M Co.'s proffered expert testimony regarding medical science and the timing of bodily injury from asbestos related disease, and also properly upheld the trial court's conclusion that the pollution exclusions do not bar coverage for asbestos related disease claims: following a careful examination of the appellate record and consideration of the briefs and arguments presented as to those issues, this court concluded that the Appellate Court sufficiently addressed those issues and, accordingly, adopted the relevant parts of that court's opinion as the proper statement of the issues and the applicable law concerning those issues.

2. The Appellate Court correctly concluded that the language of the occupational disease exclusions in the secondary insurance policies issued by L Co. and P Co. applied not only to claims brought against the plaintiff by its own employees, but clearly and unambiguously excluded from coverage claims brought by nonemployees of the plaintiff who developed asbestos related diseases while using the plaintiff's talc in the course of working for other employers: contrary to the plaintiff's claim that the term "occupational disease," which was not specifically defined by the policies issued by L Co. and P Co., is a term of art devoid of meaning outside of the employer-employee relationship and workers' compensation law, that term has a meaning, as gleaned from dictionaries in print at the time the policies were issued, outside of the context of workers' compensation law that contemplates an illness caused by factors or conditions arising out of one's employment; moreover, the occupational disease exclusions did not expressly limit their application to the plaintiff's employees, whereas other exclusions in those policies expressly contained such limiting language, and the Appellate Court's reading of the exclusion did not render the liability coverage provided by the policies meaningless, because, although the exclusions may significantly limit coverage, the parties had stipulated that there were additional classes of nonemployees whose claims were not barred by the occupational disease exclusions.

Argued March 28—officially released October 8, 2019

346 OCTOBER, 2019 333 Conn. 343

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

*Procedural History*

Action for, inter alia, a declaratory judgment to determine the rights of the parties in connection with certain insurance policies as to the defense and indemnification of the plaintiff in numerous civil actions brought against it for personal injuries allegedly sustained as a result of asbestos exposure, and for other relief, brought to the Superior Court in the judicial district of Hartford and transferred to the judicial district of Waterbury, Complex Litigation Docket, where Columbia Casualty Company et al. were joined as defendants; thereafter, the court, *Shaban, J.*, denied the motions for summary judgment filed by the defendant Mt. McKinley Insurance Company et al.; subsequently, the plaintiff withdrew the complaint as against the defendant TIG Insurance Company; thereafter, the court bifurcated the trial and ordered that the parties' declaratory judgment claims be tried to the court in four phases; subsequently, the court granted the motions for summary judgment filed by the defendant Government Employees Insurance Company and to dismiss filed by the defendant National Union Fire Insurance Company of Pittsburgh, PA, and denied the motions for summary judgment filed by the defendant National Casualty Company et al.; thereafter, the first phase was tried to the court; subsequently, Vanderbilt Minerals, LLC, was substituted as the plaintiff; thereafter, the second phase was tried to the court; subsequently, the court issued memoranda of decision; thereafter, the defendant Everest Reinsurance Company appealed and the substitute plaintiff cross appealed to the Appellate Court; subsequently, the court, *Shaban, J.*, granted the motions filed by the substitute plaintiff and the defendant Mt. McKinley Insurance Company for permission to appeal to the Appellate Court; thereafter, the Appellate Court granted the motions for permission to appeal filed by the substitute plaintiff and the defendant Mt. McKinley Insurance Company; subsequently, the substitute plaintiff and the

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

defendant Mt. McKinley Insurance Company filed separate appeals with the Appellate Court; thereafter, the substitute plaintiff and the defendant Everest Reinsurance Company filed amended appeals; subsequently, the defendant St. Paul Fire and Marine Insurance Company et al. filed separate appeals and cross appeals with the Appellate Court, which consolidated the appeals and cross appeals; thereafter, the Appellate Court, *Lavine*, *Beach*, and *Bear*, *Js.*, reversed in part the judgment of the trial court and remanded the case for further proceedings, and the substitute plaintiff and the defendant Mt. McKinley Insurance Company et al., on the granting of certification, filed separate appeals with this court. *Affirmed.*

*Michael J. Smith*, pro hac vice, with whom were *Jeffrey R. Babbin* and, on the brief, *Michael Menapace*, *Bryan W. Petrilla*, pro hac vice, *Laura P. Zaino*, *Lawrence A. Serlin*, pro hac vice, *Michael G. Albano*, *Peter R. Reynolds*, *Amy R. Paulus*, pro hac vice, *Michael L. Duffy*, pro hac vice, *William A. Meehan*, *Alexander J. Mueller*, pro hac vice, *Stephen T. Roberts*, *Robert M. Flannery*, pro hac vice, *Louis B. Blumenfeld*, *Lawrence A. Levy*, pro hac vice, *Matthew G. Conway*, *Kevin M. Haas*, pro hac vice, *Marianne May*, pro hac vice, *Michael F. Lettiero*, *Lawrence D. Mason*, pro hac vice, *John A. Lee*, pro hac vice, *James P. Sexton*, *Daniel Hargraves*, pro hac vice, *David A. Slossberg*, *John E. Rodewald*, pro hac vice, and *Heather L. McCoy*, for the appellants in SC 20001 (defendant TIG Insurance Company et al.).

*John W. Cerreta*, with whom were *Kathleen D. Monnes* and, on the brief, *Erick M. Sandler*, for the appellants in SC 20000 (defendant Travelers Casualty and Surety Company et al.).

*Jacob M. Mihm* and *Marilyn B. Fagelson*, with whom were *Proloy K. Das*, *Rachel Snow Kindseth* and, on the brief, *Stephen Hoke*, for the appellant in SC 20003 and

348 OCTOBER, 2019 333 Conn. 343

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

the appellees in SC 20000 and SC 20001 (substitute plaintiff).

*Lawrence D. Mason*, pro hac vice, with whom, on the brief, were *John A. Lee*, pro hac vice, *Michael F. Lettiero, Laura P. Zaino, Lawrence A. Serlin*, pro hac vice, *William A. Meehan, Alexander J. Mueller*, pro hac vice, *Stephen T. Roberts, Robert M. Flannery, Heather L. McCoy, Jeffrey R. Babbin, Michael Menapace, Michael J. Smith*, pro hac vice, *Bryan W. Petrilla*, pro hac vice, *Matthew G. Conway, Kevin M. Haas*, pro hac vice, *Marianne May*, pro hac vice, *Louis B. Blumenfeld* and *Lawrence A. Levy*, pro hac vice, for the appellees in SC 20003 (defendant National Casualty Company et al.).

*Alexander J. Mueller*, pro hac vice, with whom was *William A. Meehan*, for the appellees (defendant Certain London Market Insurers et al.).

*Stephanie V. Corrao* and *Laura A. Foggan*, pro hac vice, filed a brief for the Complex Insurance Claims Litigation Association as amicus curiae in SC 20000 and SC 20001.

*Michael T. McCormack* filed briefs for the National Association of Manufacturers as amicus curiae in SC 20000, SC 20001 and SC 20003.

*Opinion*

ROBINSON, C. J. These certified appeals, which present us with several significant questions of insurance law, arise from coverage disputes between the plaintiff, R.T. Vanderbilt Company, Inc. (Vanderbilt),[1] and the defendants, who are numerous insurance companies

---

[1] "The action was filed by R.T. Vanderbilt Company, Inc. During the trial court proceedings, the court granted that company's motion to substitute its successor, Vanderbilt Minerals, LLC, as the . . . plaintiff. For convenience, we refer to both entities as 'Vanderbilt' throughout this opinion." *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, 171 Conn. App. 61, 75 n.1, 156 A.3d 539 (2017).

333 Conn. 343      OCTOBER, 2019      349

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

(insurer defendants)[2] that issued primary and second-
ary comprehensive general liability insurance policies
to Vanderbilt between 1948 and 2008, stemming from
thousands of underlying lawsuits alleging injuries from
exposure to industrial talc containing asbestos that
Vanderbilt mined and sold. Vanderbilt and the insurer
defendants appeal, upon our granting of their petitions
for certification,[3] from the judgment of the Appellate

[2] The insurer defendants that are the appellants in Docket No. SC 20000
are Travelers Casualty and Surety Company, formerly known as Aetna Casu-
alty and Surety Company, and St. Paul Fire and Marine Insurance Company.

The insurer defendants that are the appellants in Docket No. SC 20001
are Mt. McKinley Insurance Company and Everest Reinsurance Company,
with Clearwater Insurance Company and later TIG Insurance Company
subsequently substituted for Mt. McKinley, along with Pacific Employers
Insurance Company, Century Indemnity Company, Ace Property and Casu-
alty Insurance Company, Old Republic Insurance Company, Certain Under-
writers at Lloyd's, London, Certain London Market Insurance Companies,
American International Underwriters Insurance Company, Granite State
Insurance Company, Fireman's Fund Insurance Company, American Insur-
ance Company, Westport Insurance Corporation, National Casualty Com-
pany, Employers Mutual Casualty Company, Munich Reinsurance America,
Inc., and Zurich International (Bermuda) Limited.

The insurer defendants that are the appellees in Docket No. SC 20003 are
National Casualty Company, Pacific Employers Insurance Company, Certain
Underwriters at Lloyd's, London, and Certain London Market Insurance
Companies, Zurich Reinsurance Company Limited, Everest Reinsurance
Company, Westport Insurance Corporation, and Fireman's Fund Insurance
Company. We refer to the insurer defendants individually when appropriate.

For the history of the direct and third-party claims against the various
insurer defendants, see *R.T. Vanderbilt Co.* v. *Hartford Accident & Indem-
nity Co.*, 171 Conn. App. 61, 76–78, 156 A.3d 539 (2017).

[3] We granted the petition of Travelers Casualty and Surety Company and
St. Paul Fire and Marine Insurance Company for certification to appeal,
limited to the following issues: "1. Did the Appellate Court properly affirm
the trial court's adoption of a 'continuous trigger' theory of coverage for
asbestos related disease claims as a matter of law and the trial court's
related preclusion of expert testimony on current medical science regarding
the actual timing of bodily injury from such disease?

"2. Did the Appellate Court properly affirm the trial court's adoption of
an 'unavailability of insurance' exception to the 'time on the risk' rule of
contract law, which provides for pro rata allocation of defense costs and
indemnity for asbestos related disease claims?" *R.T. Vanderbilt Co.* v. *Hart-
ford Accident & Indemnity Co.*, 327 Conn. 923, 171 A.3d 63 (2017).

We also granted the petition of Mt. McKinley Insurance Company and
Everest Reinsurance Company, limited to the following issues: "1. Did the
Appellate Court properly affirm the trial court's adoption of a 'continuous

350 OCTOBER, 2019 333 Conn. 343

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

Court affirming in part and reversing in part numerous interlocutory decisions made by the trial court in connection with the first and second phases of a complex trial between the parties. *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, 171 Conn. App. 61, 75–76, 156 A.3d 539 (2017). On appeal, the insurer defendants claim that the Appellate Court improperly (1) upheld the trial court's adoption of a "continuous trigger" theory of coverage for asbestos related disease claims as a matter of law and the trial court's related preclusion of expert testimony on current medical science regarding the actual timing of bodily injury from such disease, (2) upheld the trial court's adoption of an "unavailability of insurance" exception to the "time on the risk" rule of contract law, which provides for pro rata allocation of defense costs and indemnity for asbestos related disease claims, and (3) interpreted pollution exclusion clauses in certain insurance policies as applicable only to claims arising from "traditional" environmental pollution, rather than to those arising from asbestos exposure in indoor working environments. In its appeal, Vanderbilt claims that the Appel-

trigger' theory of coverage for asbestos related disease claims as a matter of law and the trial court's related preclusion of expert testimony on current medical science regarding the actual timing of bodily injury from such disease?

"2. Did the Appellate Court properly affirm the trial court's adoption of an 'unavailability of insurance' exception to the 'time on the risk' rule of contract law, which provides for pro rata allocation of defense costs and indemnity for asbestos related disease claims?

"3. Did the Appellate Court properly interpret pollution exclusion clauses in certain insurance policies as applicable only to claims arising from 'traditional' environmental pollution and not to those arising from asbestos exposure in indoor working environments?" *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, 327 Conn. 923, 923–24, 171 A.3d 62 (2017).

Finally, we also granted Vanderbilt's cross petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly interpret occupational disease exclusion clauses in certain insurance policies as precluding coverage for claims of occupational disease, regardless of whether the claimant was employed by the policyholder or by a third-party user of the claimant's allegedly harmful product?" *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, 327 Conn. 925, 171 A.3d 61 (2017).

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

late Court improperly construed occupational disease exclusions present in certain policies as not limited to claims brought by Vanderbilt's own employees. Because we conclude that the Appellate Court's comprehensive opinion properly resolved these significant issues, we affirm the judgment of the Appellate Court.

The opinion of the Appellate Court aptly sets forth the relevant background facts and procedural history.[4] "Vanderbilt is a Connecticut corporation engaged in the mining and sale of various chemical and mineral products. In 1948, it began to produce industrial talc through its subsidiary, Gouverneur Talc Company. Vanderbilt continued to mine and sell talc until 2008, when it ceased production and sold off the last of its inventory.

"Over the past several decades, thousands of underlying actions have been filed against Vanderbilt in various jurisdictions throughout the United States, many of which remain pending. Those actions alleged that talc and silica mined and sold by Vanderbilt contained asbestos or otherwise caused diseases that are correlated to asbestos exposure, such as mesothelioma, other asbestos related cancer, and asbestosis (collectively, asbestos related disease). In response, Vanderbilt has taken the position that its industrial talc does not contain asbestos. From the time that it started mining talc, Vanderbilt purchased or attempted to purchase primary and secondary comprehensive general liability insurance to cover the defense and indemnity costs of asbestos related claims.

"Vanderbilt brought the present action against several insurance companies that issued it primary insur-

---

[4] For the sake of brevity, we recite only the most salient background facts and procedural history, as distilled from the record and the Appellate Court's opinion. Readers desiring a more comprehensive review of this case's complex facts and procedural history should consult the excellent recitation in the Appellate Court's opinion. See *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, supra, 171 Conn. App. 76–87.

352 OCTOBER, 2019 333 Conn. 343

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

ance policies between 1948 and 2008 . . . .” Id., 76–77; see footnote 2 of this opinion (listing defendants). In particular, Vanderbilt alleged that its primary insurers—Hartford Accident and Indemnity Company, and Continental Casualty Company, Columbia Casualty Company and Continental Insurance Company (collectively, Continental) “had breached their contractual obligations to pay their proper shares of defense and indemnity costs in the underlying actions. Vanderbilt also sought a declaratory judgment as to the parties’ respective rights and responsibilities under the policies at issue.

“Continental subsequently filed a [third-party] complaint against various insurance companies that had provided secondary coverage—umbrella or excess[5]—to Vanderbilt during the time that it was in the talc business.” (Footnote altered.) *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, supra, 171 Conn. App. 77. “Vanderbilt thereafter brought direct claims against these [third-party] secondary insurers.” Id., 78.

“Prior to the start of trial, the trial court issued a series of scheduling orders, pursuant to which it separated the trial into four phases. In the first two phases, which were tried to the court and have been completed, the court addressed Vanderbilt’s declaratory judgment claims and related counterclaims and cross claims. The primary issue before the court in those phases was how insurance obligations are to be allocated with respect to long latency[6] asbestos related claims alleging

---

[5] As the Appellate Court noted, the “ ‘phrase “follow form” refers to the practice, common in excess policies, of having the [second layer] coverage follow substantively the primary layer provided by the main insurer . . . .’ ” *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, supra, 171 Conn. App. 257 n.91.

As the Appellate Court also noted, “the term ‘umbrella coverage’ is often used not only with reference to policies that offer both excess coverage and primary drop-down insurance, but also specifically to the drop-down portion of such policies.” Id., 276 n.101.

[6] “Throughout this opinion, we use the terms ‘long latency,’ ‘long-tail,’ and ‘progressive injury’ interchangeably. Those terms refer to the fact that toxic tort claims typically allege that exposure to toxins such as asbestos causes

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

injuries that occur over the course of years or even decades and, therefore, potentially implicate multiple insurance policy periods. Specifically, in Phase I, the court addressed the question of how defense costs for the underlying actions were to be allocated as between Vanderbilt and its insurers. That required a determination of (1) the periods during which the defendants' insurance policies were in effect and (2) whether Vanderbilt should be treated as self-insured for any period so as to create an equitable obligation to contribute to the costs of its defense. In Phase II, the court considered the same questions with respect to indemnity costs. In that phase, the court also issued rulings with respect to the meaning of various policy provisions, the exhaustion of Vanderbilt's primary policies, and related issues. In Phase III of the trial, which also will be tried to the court, the court plans to adjudicate the defendants' claims for recovery of overpayment of insurance costs. In Phase IV, Vanderbilt's breach of contract claims against its insurers are to be tried to a jury.'' (Footnote altered.) Id., 78–79.

"In addressing the allocation questions in Phases I and II, the trial court proceeded on the assumption that Connecticut follows a pro rata, [time on the risk] approach to allocating insurance obligations in long-tail cases. See footnote [6] of this opinion. Under that allocation scheme, the court assumed that a victim of asbestos related disease suffers continuous injuries commencing at the time of initial exposure to asbestos and extending until disease manifests and, therefore, that defense and indemnity costs must be allocated across all of the insurance policies on the risk (i.e., potentially liable) during that period (allocation block). The court further assumed that (1) the policyholder is responsible for a pro rata share of costs for any period

a series of continuing, indivisible injuries that develop gradually over time but may not manifest for many years.'' *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, supra, 171 Conn. App. 78 n.5.

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

during which it is uninsured or underinsured (proration to the insured), including so-called 'orphan share' periods covered by policies that were lost, destroyed, or issued by insurers that subsequently became insolvent; but (2) Connecticut has embraced an unavailability of insurance exception pursuant to which there is no proration to the insured for periods during which insurance is not available. Applying these principles to the present case, the court held evidentiary hearings during Phases I and II to determine, among other things, whether defense and indemnity insurance coverage, respectively, was available for asbestos related claims between 1948 and 2008 and, if so, whether Vanderbilt availed itself of such coverage." Id., 79–80.

On the basis of findings of fact rendered after Phase I,[7] the trial court "determined that the allocation of defense and indemnity costs would be applied prospectively in the following manner, on the basis of a total potential exposure period of [732] months running from 1948 through 2008:[8] (1) as to defense costs, Vanderbilt would be liable for 265 of the [732] months; (2) as to indemnity costs, Vanderbilt would be liable for [96] of the [732] months; and (3) Vanderbilt's responsibility as to both defense and indemnity costs would be adjusted upward for any additional periods when there was a gap in coverage or an insolvent insurer. The court applied these same findings, principles, and allocation rules to underlying actions that alleged harms arising from nonasbestos particulates such as silica. Specifically, the court credited testimony that all of the underlying actions, whether on their face or through subsequent discovery or investigation, involved claims of exposure to asbestos.

[7] For those specific findings, see *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, supra, 171 Conn. App. 80–82.

[8] See *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, supra, 171 Conn. App. 187 n.54 (noting immaterial miscalculation with respect to length of allocation block).

333 Conn. 343 OCTOBER, 2019 355

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

"In its Phase II decision, the court also considered the applicability of two types of exclusions contained in certain of Vanderbilt's excess and umbrella policies. The court first addressed the claim by several secondary insurers that the pollution exclusion clauses contained in their policies barred coverage for the underlying actions. The court concluded that the relevant policy language was ambiguous as applied to the asbestos related claims and, therefore, that the exclusions did not preclude coverage. The court also addressed the issue of whether occupational disease exclusions contained in certain secondary policies applied only to claims brought by the policyholder's own employees. The court found that the exclusions were unambiguous and that they did, in fact, bar coverage only for claims brought by Vanderbilt's own employees." (Footnote altered.) Id., 82–83.

"Following the completion of the Phase II trial, Vanderbilt and several defendants filed appeals and cross appeals [with the Appellate Court], challenging approximately twenty of the court's conclusions and findings."[9] Id., 83. The Appellate Court subsequently issued an opinion of extraordinary complexity and comprehensiveness addressing a plethora of issues.[10] With respect to

---

[9] "Everest [Reinsurance Company] filed an immediate appeal from the trial court's Phase I and Phase II rulings on the ground that the rulings constituted a final judgment as to it. Vanderbilt and other defendants were subsequently granted permission to file interlocutory appeals pursuant to Practice Book § 61-4 (a), which provides in relevant part that an interlocutory ruling is considered to be an appealable final judgment when 'the trial court makes a written determination that the issues resolved by the judgment are of such significance to the determination of the outcome of the case that the delay incident to the appeal would be justified, and the chief justice or chief judge of the court having appellate jurisdiction concurs.' " *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, supra, 171 Conn. App. 83–84 n.9.

[10] For a summary of all of the issues considered by the Appellate Court, see *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, supra, 171 Conn. App. 84–87.

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

the issues now before us in this certified appeal, the Appellate Court first concluded that the trial court properly adopted a "continuous trigger" theory of coverage for asbestos related disease claims as a matter of law and, accordingly, properly precluded the admission of expert testimony on current medical science regarding the actual timing of bodily injury from such disease. Id., 118–19. The Appellate Court further upheld the trial court's adoption of an "unavailability of insurance" exception to the "time on the risk" rule of contract law, which provides for the pro rata allocation of defense costs and indemnity for asbestos related disease claims. Id., 143. The Appellate Court then interpreted the pollution exclusion clauses as applicable only to claims arising from "traditional environmental pollution," rather than those arising from asbestos exposure in indoor working environments. Id., 252. Finally, the Appellate Court concluded that the trial court had improperly construed the occupational disease exclusions as "bar-[ring] coverage only for occupational disease claims brought by a policyholder's own employees and that the exclusions do not apply to complainants who developed occupational disease while using the policyholder's products in the course of working for another employer." Id., 256.

The Appellate Court rendered judgment reversing the decisions of the trial court "with respect to [its] determinations that (1) Vanderbilt is responsible for defense costs for the period of March 3, 1993 through April 24, 2007, (2) a default date of first exposure of January 1, 1962, applies to pending and future claims, and (3) the occupational disease exclusions in certain secondary policies apply only to claims brought by Vanderbilt's own employees; the proper allocation methodology and the prospective application of that methodology are clarified as set forth herein . . . ." Id., 309. The Appellate Court then remanded the case to the trial court

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

"for further proceedings consistent with [its] opinion." Id. These certified appeals followed. See footnote 3 of this opinion.

I

We begin with the claims of the numerous insurer defendants in the certified appeals docketed as Docket Nos. SC 20000 and SC 20001. See footnote 2 of this opinion. Specifically, they contend that the Appellate Court improperly upheld the decision of the trial court (1) adopting a "continuous trigger" theory of coverage for asbestos related disease claims as a matter of law, (2) precluding expert testimony on current medical science regarding the actual timing of bodily injury from asbestos related diseases, and (3) adopting an "unavailability of insurance" exception to the "time on the risk" rule of contract law. The insurer defendants also claim that the Appellate Court improperly interpreted pollution exclusion clauses in certain insurance policies as applicable only to claims arising from "traditional environmental pollution," rather than to those arising from asbestos exposure in indoor working environments.

After carefully examining the record on appeal and considering the briefs and arguments of the parties, we have concluded that the judgment of the Appellate Court should be affirmed with respect to these issues. The Appellate Court's thorough and well reasoned opinion more than sufficiently addresses these certified questions, and there is no need for us to repeat the discussion contained therein. We therefore adopt parts III A, III B, and IV A of the Appellate Court's opinion as the proper statement of the issues and the applicable law concerning those issues. See, e.g., *Deutsche Bank AG* v. *Sebastian Holdings, Inc.*, 331 Conn. 379, 384, 204 A.3d 664 (2019); *State* v. *Henderson*, 330 Conn. 793, 799, 201 A.3d 389 (2019).

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

II

We next turn to Vanderbilt's claim, in Docket No. SC 20003, that the Appellate Court incorrectly determined that occupational disease exclusion clauses in two excess policies apply to claims brought by nonemployees of Vanderbilt who allegedly developed an occupational disease while using Vanderbilt talc at any workplace. The Appellate Court's opinion sets forth the following additional facts and procedural history relevant to this claim. "At trial, several of Vanderbilt's secondary insurers [secondary insurers][11] either sought declaratory judgments determining or raised special defenses or claims alleging that occupational disease exclusions in their policies precluded coverage for some of the underlying actions. Two versions of the occupational disease exclusion, contained in policies issued by Certain Underwriters at Lloyd's, London (Lloyd's), and Pacific Employers Insurance Company (Pacific), are at issue.[12]

"The first policy at issue, Lloyd's policy number 77/18503/1/PNB21250D, was in effect from May 17, 1977 through March 3, 1979. The policy contains an endorsement clause stating in relevant part that 'this policy shall not apply . . . to personal injury (fatal or nonfatal) by occupational disease.' Several other defendants issued secondary policies following form to the Lloyd's policy.[13]

"The second policy at issue, Pacific policy number XMO017535 (NCA15), was in effect from March 3, 1985 through March 3, 1986. It contains the following

_____

[11] For a listing of these secondary insurers, see footnote 2 of this opinion.

[12] "The trial court found that the minor variations in policy language between the two versions are not relevant to the question of whether the occupational disease exclusions apply to nonemployees of the policyholder. On appeal, the parties do not challenge this finding or argue that the two provisions are materially different." *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, supra, 171 Conn. App. 256 n.90.

[13] See footnote 5 of this opinion.

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

endorsement clause: 'This policy does not apply to any liability arising out of: Occupational Disease.' National Casualty [Company (National Casualty)], [a secondary insurer that] has taken the lead in challenging the trial court's rulings regarding the occupational disease exclusions, issued an excess policy, number XU000233, which follows form to the Pacific policy. Lloyd's also issued an excess policy that follows form to the Pacific policy. None of the relevant policies defines the term 'occupational disease.'

"In addition to these occupational disease exclusions, the Lloyd's and Pacific policies contain employers' liability exclusions. The Lloyd's policy provides that 'this policy shall not apply . . . to the liability of employees.' The Pacific policy provides that '[t]his policy does not apply to personal injury to any employee of the insured arising out of and in the course of his employment by the insured or to any obligation of the insured to indemnify another because of damages arising out of such injury.' In addition, National Casualty's excess policy, while following form to the Pacific policy, also includes its own 'employers liability exclusion,' which is somewhat broader than the one in the Pacific policy. It provides in relevant part: '[T]his policy shall not apply to any liability for bodily injury, sickness, disease, disability or shock, including death at any time resulting therefrom . . . sustained by any employee of the insured and arising out of and in the course of his employment by the insured.' Last, both the Lloyd's and Pacific policies contain exclusions for obligations for which the insured may be held liable under workers' compensation, unemployment compensation, or disability benefits laws.

"To facilitate the trial court's resolution of the issue, the parties stipulated during the second phase of the trial that none of the claimants in the underlying actions [is] or ever [was a] Vanderbilt [employee]. The parties

360 OCTOBER, 2019 333 Conn. 343

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

further stipulated that the underlying complaints fall into three categories: those that allege (1) exposure to Vanderbilt products solely through the workplace of another employer, (2) exposure both in and outside the workplace, and (3) exposure solely outside the workplace. Accordingly, if the occupational disease exclusions do apply to nonemployees of Vanderbilt, they likely will bar coverage for some but not all of the underlying complaints during the relevant policy years.[14]

"In its Phase II decision, the trial court concluded that the occupational disease exclusions apply only to claims brought by Vanderbilt's own employees. Because the policies themselves do not define the term 'occupational disease,' the court looked to the Workers' Compensation Act (act), General Statutes § 31-275 et seq., for a definition of the term. Section 31-275 (15) provides that ' "[o]ccupational disease" includes any disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such, and includes any disease due to or attributable to exposure to or contact with any radioactive material by an employee in the course of his employment.' The trial court concluded that the term, as defined in the statute, was unambiguous, and that it applied solely to employees of the insured. The court rejected the defendants' argument that such a construction would render the

---

[14] "For this reason, [the Appellate Court] reject[ed] Vanderbilt's argument that the [insurer] defendants' interpretation of the occupational disease exclusions would render much of the coverage afforded by the policies 'illusory.' At the very least, the exclusions would not bar coverage for claims brought by complainants in category 3.

"[The Appellate Court] note[d] in this respect that the parties . . . neither briefed nor asked [it] to resolve the question of whether, if the occupational disease exclusions do apply to nonemployees, they bar coverage for underlying actions in category 2, which allege both workplace and nonworkplace exposure. That question will fall to the trial court on remand to address in the first instance." *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, supra, 171 Conn. App. 258 n.92.

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

occupational disease exclusion superfluous, insofar as the employers' liability exclusions in the policies already preclude coverage for any claims of workplace injury or disease by employees of the policyholder. The court reasoned that the act draws a distinction between occupational diseases; General Statutes § 31-275 (15); and ' ''[p]ersonal injur[ies]'' '; General Statutes § 31-275 (16); and that the policies at issue incorporate that distinction—whereas the occupational disease exclusion applies to employees of an insured who allege occupational diseases, the employers' liability exclusion applies to employees who allege that they have suffered sudden personal injuries while on the job.

"Because the court agreed with Vanderbilt that the occupational disease exclusions do not apply to any of the underlying claims, the court did not address Vanderbilt's alternative arguments that (1) in the event that the policy language is determined to be ambiguous, the exclusions should be construed in favor of the insured pursuant to the doctrine of contra proferentem, and (2) certain of the defendants have waived their right to invoke the exclusions." (Footnote added; footnote altered; footnotes in original.) *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, supra, 171 Conn. App. 256–59.

On appeal, the Appellate Court disagreed with the trial court's construction of the occupational disease exclusions, concluding instead that they "unambiguously bar coverage for occupational disease claims brought not only by employees of Vanderbilt but also by individuals who contracted an occupational disease in the course of their work for other employers." (Footnote omitted.) Id., 269–70. In concluding that the language of the exclusions was plain and unambiguous, the Appellate Court rejected Vanderbilt's "primary argument," namely, "that the term occupational disease is so interwoven with the concept of workers' compensation and other claims by an employee against his employer

362 OCTOBER, 2019 333 Conn. 343

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

as to be meaningless outside of that particular context.'' (Internal quotation marks omitted.) Id., 262–63. The Appellate Court also observed that, when the policies were drafted ''between the late 1970s and mid-1980s, 'occupational disease' had a common and ordinary meaning within the legal and insurance fields.''[15] Id., 263–64. The Appellate Court also relied on the rules of contract construction and noted that the employer liability exclusions were expressly limited to employees of the insured, whereas the ''occupational disease exclusions are framed broadly and do not contain any similar language of limitation . . . .'' Id., 269. Accordingly, the Appellate Court reversed the judgment of the trial court with respect to the occupational disease exclusions and remanded the case to the trial court with direction ''to consider Vanderbilt's alternative argument that certain defendants are precluded from invoking the exclusions because they failed to timely plead the exclusions as a special defense.'' Id., 270.

On appeal, Vanderbilt claims that the Appellate Court improperly failed to limit the application of the occupational disease exclusions to claims brought against Vanderbilt by its own employees. Vanderbilt relies on case law and legal dictionaries; see, e.g., *Ins. Co. of North America* v. *Forty-Eight Insulations, Inc.*, 451 F. Supp. 1230 (E.D. Mich. 1978), aff'd, 633 F.2d 1212 (6th Cir. 1980); *Nolan* v. *Johns-Manville Asbestos & Magnesia Materials Co.*, 74 Ill. App. 3d 778, 392 N.E.2d 1352 (1979), aff'd, 85 Ill. 2d 161, 421 N.E.2d 864 (1981); *Commercial Union Ins. Co.* v. *Porter Hayden Co.*, 116 Md.

---

[15] On this point, the Appellate Court relied on, inter alia, a Harvard Law Review note, ''Compensating Victims of Occupational Disease,'' 93 Harv. L. Rev. 916, 926 (1980), in support of the proposition that, at the time, there was a ''proliferation'' of litigation concerning occupational diseases, in which individuals barred by workers' compensation laws from ''suing their employers were instead 'su[ing] the manufacturer or seller of a product used in the workplace if that product caused the illness.' '' *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, supra, 171 Conn. App. 264. But see footnote 25 of this opinion.

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

App. 605, 698 A.2d 1167, cert. denied, 348 Md. 205, 703 A.2d 147 (1997); Black's Law Dictionary (5th Ed. 1979); and argues that the term " 'occupational disease' is a term of art that refers only to disputes between [the] employer and [the] employee or to statutory compensation plans for employees." Vanderbilt also contends that the Appellate Court's interpretation of the term "occupational disease" is inconsistent with the long-standing rules by which we construe insurance policies and their exclusions, in particular that an insurer bears a heightened burden in proving the applicability of an exclusion and that ambiguous exclusions are construed in favor of the insured. Supported by the amicus curiae National Association of Manufacturers, Vanderbilt contends that the Appellate Court's construction of the exclusion to the contrary "dramatically reduce[s] general liability coverage for manufacturers, particularly in the context of claims of disease resulting from alleged exposure to asbestos and other industrial products."

In response, National Casualty, leading the secondary insurers, argues that the occupational disease exclusions are plain and unambiguous. Citing, among other cases, *Ricigliano* v. *Ideal Forging Corp.*, 280 Conn. 723, 912 A.2d 462 (2006), National Casualty contends that the phrase "occupational disease" has a plain meaning beyond the narrow workers' compensation context insofar as "an 'occupational disease' is a disease arising from engaging in one's occupation—if an employee develops a condition arising out of his or her employment, that employee has an 'occupational disease,' *no matter where that employee works*." (Emphasis added.) Responding to Vanderbilt's historical and contextual analysis of the term, National Casualty relies on *TKK USA, Inc.* v. *Safety National Casualty Corp.*, 727 F.3d 782 (7th Cir. 2013), *Rodriguez* v. *E.D. Construction, Inc.*, 126 Conn. App. 717, 12 A.3d 603, cert. denied, 301 Conn. 904, 17 A.3d 1046 (2011), *Wyness* v. *Armstrong World Industries, Inc.*, 171 Ill. App. 3d 676, 525 N.E.2d

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

907 (1988), *Tooey* v. *AK Steel Corp.*, 623 Pa. 60, 81 A.3d 851 (2013), and *United National Ins. Co.* v. *J.H. France Refractories Co.*, 36 Pa. D. & C.4th 400, 409–10 (C.P. 1996), to contend that the meaning of the phrase "occupational disease" has not changed over time "from the pre-workers' compensation era to the present"; instead, only the remedies available for such illness claims have changed, with the addition of workers' compensation coverage in the first instance. National Casualty also argues that Vanderbilt's proffered construction of the occupational disease exclusions violates rules of contract interpretation by adding nonexistent language and rendering the exclusions "redundant, as the policies at issue contain [e]mployers' [l]iability and [w]orkers' [c]ompensation exclusions that act specifically to bar Vanderbilt employees' workplace related claims." National Casualty emphasizes that the occupational disease exclusions were "stand-alone provisions outside of the base policy forms and, consequently, readily identifiable," meaning that either Vanderbilt or its sophisticated brokers, acting as its agent, "knew exactly the scope and limitations of the coverage Vanderbilt was procuring," rendering that coverage still meaningful with respect to asbestos exposure that was even partially outside the workplace. In resolving this question of first impression nationally, we agree with National Casualty and conclude that the Appellate Court properly interpreted the occupational disease exclusions to exclude occupational disease claims brought against Vanderbilt by both its employees and nonemployees.

We begin with well established principles governing the interpretation of insurance policies. "[C]onstruction of a contract of insurance presents a question of law for the [trial] court which this court reviews de novo. . . . The determinative question is the intent of the parties, that is, what coverage the [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . In evalu-

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

ating the expectations of the parties, we are mindful of the principle that provisions in insurance contracts must be construed as laymen would understand [them] and not according to the interpretation of sophisticated underwriters and that the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view. . . . [W]hen the words of an insurance contract are, without violence, susceptible of two [equally responsible] interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted. . . . [T]his rule of construction favorable to the insured extends to exclusion clauses. . . . When construing exclusion clauses, the language should be construed in favor of the insured unless it has a high degree of certainty that the policy language clearly and unambiguously excludes the claim. . . . While the insured bears the burden of proving coverage, the insurer bears the burden of proving that an exclusion to coverage applies.'' (Citations omitted; internal quotation marks omitted.) *Nationwide Mutual Ins. Co.* v. *Pasiak*, 327 Conn. 225, 238–39, 173 A.3d 888 (2017); see, e.g., *Travelers Casualty & Surety Co. of America* v. *Netherlands Ins. Co.*, 312 Conn. 714, 740, 95 A.3d 1031 (2014) (''[U]nambiguous terms are to be given their plain and ordinary meaning. . . . As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading.'' [Internal quotation marks omitted.]). But see *Travelers Casualty & Surety Co. of America* v. *Netherlands Ins. Co.*, supra, 740–41 (noting that contra proferentem rule does not apply in disputes between insurers). ''[A]lthough policy exclusions are strictly construed in favor of the insured . . . the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous.'' (Internal quotation marks omitted.) *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, 290 Conn. 767, 796, 967 A.2d 1 (2009).

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

We begin with the language of the occupational disease exclusions at issue. The first policy at issue, Lloyd's policy number 77/18503/1/PNB21250D, was in effect from May 17, 1977 through March 3, 1979. The occupational disease exclusion for this policy is contained in an endorsement stating that "this policy shall not apply . . . to personal injury (fatal or nonfatal) by occupational disease." The second policy at issue, Pacific policy number XMO017535 (NCA15), was in effect from March 3, 1985 through March 3, 1986. It contains the following endorsement with an occupational disease exclusion: "This policy does not apply to any liability arising out of: Occupational Disease." Because neither of the policies at issue defines the term "occupational disease," our analysis begins with its ordinary meaning, as ascertained from dictionaries contemporary to the 1970s and 1980s, when the policies were issued. See, e.g., *Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, 311 Conn. 29, 42 n.8, 84 A.3d 1167 (2014); *R.T. Vanderbilt Co.* v. *Continental Casualty Co.*, 273 Conn. 448, 463, 870 A.2d 1048 (2005); *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, 259 Conn. 527, 539, 791 A.2d 489 (2002). The Random House Dictionary of the English Language Unabridged (1966) p. 996, defines "occupational disease" as synonymous with "industrial disease," namely, "a disease caused by the conditions or hazards of a particular occupation." Similarly, Webster's Third New International Dictionary (1961) pp. 1560–61, defines "[o]ccupational disease" as "an illness caused by factors arising from one's occupation <dermatitis is often an *occupational disease*> . . . ."[16] (Emphasis in original.)

___

[16] We note that the dictionary definition of "occupational disease" has remained consistent in all material aspects for many decades, both preceding and succeeding the drafting of the policy provisions at issue in this appeal. Compare American Heritage College Dictionary (4th Ed. 2007) p. 961 (defining "occupational disease" as "[a] disease resulting from the conditions of a person's work, trade, or occupation"), with Webster's New International Dictionary (2d Ed. 1934) p. 1684 (defining "occupational disease" as "[a] disease brought on by or arising from the occupation of the patient, as miner's phthisis, etc.").

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

Contemporaneous legal dictionaries contain similar general definitions of the term "occupational disease,"[17] along with specifically indicating the existence of a relationship between occupational diseases, as previously defined, and workers' compensation statutory schemes. Notably, the fifth edition of Black's Law Dictionary, published in 1979 and relied on heavily by Vanderbilt, defines "[o]ccupational disease" as "[a] disease (as black lung disease incurred by miners) resulting from exposure during employment to conditions or substances detrimental to health. *Compensation for such is provided by state [workers'] compensation acts and such federal acts as the Black Lung Benefits Act.* Impairment of health not caused by accident but by exposure to conditions arising out of or in the course of one's employment." (Emphasis added.) Black's Law Dictionary (5th Ed. 1979) p. 973.

The Black's Law Dictionary entry then goes on to explain that a "disease is compensable under [workers'] compensation statute as being an 'occupational' disease where: (1) the disease is contracted in the course of employment; (2) the disease is peculiar to the claimant's employment by its causes and the characteristics of its manifestation or the conditions of employment result in a hazard which distinguishes the employment in character from employment generally; and (3) the employment creates a risk of contracting the disease in a greater degree and in a different manner than the public generally."[18] Id.; accord Black's Law Dictionary (10th

---

[17] Legal dictionary definitions are also relevant to our textual analysis of the policy provisions at issue. See, e.g., *Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, supra, 311 Conn. 42–43 (considering conventional and legal dictionary definitions of term "related" in insurance policy); *Springdale Donuts, Inc.* v. *Aetna Casualty & Surety Co. of Illinois*, 247 Conn. 801, 810–11, 724 A.2d 1117 (1999) (considering conventional and Black's Law Dictionary definition of term "publication" to determine whether underlying claims constituted slander covered by commercial general liability policy).

[18] We note that the immediately preceding edition of Black's Law Dictionary defined "occupational disease" more generally—akin to the ordinary language dictionaries—as a "[d]isease gradually contracted in usual and

368 OCTOBER, 2019 333 Conn. 343

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

Ed. 2014) p. 1248; see also *Ricigliano* v. *Ideal Forging Corp.*, supra, 280 Conn. 731–32 (discussing statutory definitions of "occupational disease" under § 31-275 [15] as consistent with dictionary definitions). Although the relationship between occupational disease and workers' compensation is now a matter of black letter law, none of the definitions on which Vanderbilt relies— including the definition in Black's Law Dictionary— suggests in any way that the phrase "occupational disease" is a construct devoid of meaning outside the law of workers' compensation,[19] notwithstanding its obvious significance within that area of the law. Instead, we

ordinary course of employment, because thereof, and incidental thereto." Black's Law Dictionary (4th Ed. 1968) p. 1230; see also Ballentine's Law Dictionary (3d Ed. 1969) p. 879 ("Occupational disease" is "[a] disease which develops gradually and imperceptibly as a result of *engaging in a particular employment and is generally known and understood to be a usual and natural incident or hazard of such employment.* . . . A disease caused by or especially incident to a particular employment. . . . Something other than an accidental injury. But none the less a personal injury, the injury being regarded as sustained when the employee becomes unable to work." [Citations omitted; emphasis added.]).

[19] In a footnote in its brief, Vanderbilt crafts a hypothetical to contend that "[a]pplying 'occupational disease' outside of the context of claims brought against Vanderbilt by its employees leads to absurd results," namely, a high school student alleging exposure to talc while working part-time at a family business or a babysitter alleging exposure to talc in the home where he or she is babysitting. Vanderbilt states that the "insurers would argue that the students were 'working' when they were allegedly exposed to talc and, therefore, [that] the 'occupational disease' exclusions bar coverage." We disagree that this hypothetical is illustrative of an absurd result, even under the Black's Law Dictionary definition propounded by Vanderbilt. Although the hypothetical babysitter's disease might well have been contracted during his or her employment, that fact does not, without more, render it occupational in nature. See Black's Law Dictionary (5th Ed. 1979) p. 973; see, e.g., 2 M. Rothstein et al., Employment Law (6th Ed. 2019) § 7:24 ("[a]n ailment does not become an occupational disease simply because it is contracted on the employer's premises" [internal quotation marks omitted]). Put differently, in determining whether the disease in the hypothetical argued by Vanderbilt is occupational in nature, the babysitter performing ordinary child care tasks might well be situated differently from the other student in the hypothetical who works at a family business, if that family business is an industry that had peculiar incidence of diseases occasioned by exposure to talc.

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

read those definitions only to highlight the availability of workers' compensation as a common, legal remedy for claims arising from the underlying condition. Thus, we disagree with Vanderbilt's argument in its reply brief that '' '[o]ccupational [d]isease' [is] a term of art that is tied to the employee-employer relationship,'' thus meaning that ''no specific reference to employees needed to be added to the exclusion.''

Given the lack of any verbiage in commonly used dictionary definitions expressly limiting the definition of occupational disease to the workers' compensation context,[20] it is significant that the text of the occupational disease exclusions does not contain language expressly limiting their application to the employees of the insured. In contrast, other exclusions in the relevant policies, namely, for employer's liability and workers' compensation, expressly contain such language.[21] This omission is significant because it indicates that, when

[20] Indeed, this court previously has rejected attempts to import other areas of the law to vary otherwise clear and unambiguous insurance policy language. In concluding that ''emotional distress'' was not ''bodily injury'' for purposes of an insurance policy, this court rejected the argument that ''emotional distress is within the insurance policy definition of bodily injury because modern medical science teaches that emotional distress is accompanied by some physical manifestations,'' as well as that ''such an interpretation is consistent with our precedents in the areas of tort and workers' compensation law.'' *Moore* v. *Continental Casualty Co.*, 252 Conn. 405, 414, 746 A.2d 1252 (2000). Stating that we did ''not question the modern medical understanding of the interrelatedness of the mind and body,'' this court nevertheless ''disagree[d] that such an understanding determines the meaning of the policy language in question in the present case. We also disagree[d] with the contention that our precedents in the areas of tort and workers' compensation law appropriately inform the meaning of that policy language.'' Id., 414–15.

[21] The Pacific policy provides that it ''does not apply . . . to any obligation for which the [i]nsured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law . . . .'' A separate rider to the Pacific policy states that ''[t]his policy does not apply to personal injury to any employee of the insured arising out of and in the course of his employment by the insured or to any obligation of the insured to indemnify another because of damages arising out of such injury.''

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

the drafters of the policy desired to limit the application of an exclusion to a certain group of individuals, they did so. It renders all the more unambiguous the lack of any such express limitation in the occupational disease exclusions. See *Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, supra, 311 Conn. 54 ("[t]ypically, when different terms are employed within the same writing, different meanings are intended"); *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, supra, 259 Conn. 539–40 (use of word "sudden" in "sudden and accidental" exception to pollution exclusion was intended to preclude coverage for gradually occurring pollution, "so that only a temporally abrupt release of pollutants would be covered as an exception to the general pollution exclusion").

Indeed, to read the exclusions as urged by Vanderbilt would require us to add otherwise nonexistent language specifically limiting their application to Vanderbilt's employees, which is contrary to how we interpret contracts, including insurance policies. See *Moore* v. *Continental Casualty Co.*, 252 Conn. 405, 414, 746 A.2d 1252 (2000) ("We cannot rewrite the insurance policy by adding semicolons any more than we can by adding words. If the policy had referred to 'green vehicles,' and defined that term as 'green cars, trucks or motorcycles,' it is unlikely that there would be a reasonable dispute about whether blue trucks and red motorcycles were intended to be included in the definition."); see also *Travelers Ins. Co.* v. *Namerow*, 257 Conn. 812, 827, 778 A.2d 168 (2001) ("The language of the policy clearly does not contain the word 'motive' or any other analogous term. Under the language of the policy, the plaintiff

The Lloyd's policy provides that it "shall not apply . . . to any obligation for which the [a]ssured and any company as its insurer may be held liable under any [w]orkmen's [c]ompensation, unemployment compensation or disability benefits law provided, however, that this exclusion does not apply to liability of others assumed by the [n]amed [a]ssured under contract or agreement . . . ."

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

did not need to prove motive as an element of its claim that the defendants' loss fell within the [intentional act] policy exclusion." [Footnote omitted.]), superseded in part on other grounds, 261 Conn. 784, 807 A.2d 467 (2002); *Community Action for Greater Middlesex County, Inc.* v. *American Alliance Ins. Co.*, 254 Conn. 387, 403, 757 A.2d 1074 (2000) ("[t]here is nothing in the language of the exclusion to indicate that the alleged abuse or molestation must be sexually motivated or calculated to arouse the person or persons involved in the offending conduct; the boys' nonconsensual grabbing and fondling of [the victim] fall within the plain meaning of the words 'abuse' and 'molestation' irrespective of the boys' subjective state of mind"); *Moore* v. *Continental Casualty Co.*, supra, 415 (rejecting reading of "definition of ' "[b]odily [i]njury" ' so as to mean not merely bodily harm, bodily sickness, and bodily disease, but also nonbodily sickness and nonbodily disease" because "[t]he definition of ' "[b]odily [i]njury" ' in the policy does not provide: bodily harm; sickness; or disease").

We also disagree with Vanderbilt's reliance on provisions in the Lloyd's policy form, including the limits of liability and special conditions, referring to "occupational disease sustained by any employee of the assured," as "mak[ing] clear that 'occupational disease' is a type of claim that only applies to Vanderbilt's employees and is distinct from a 'product liability' claim, with separate policy limits."[22] In the absence of a specific definition of the term "occupational disease" to that effect in the policy's definitions section, it is significant that the occupational disease exclusions at issue in this appeal are provided via endorsement, which, like a "rider . . . is a writing added or attached to a policy or certificate of insurance which expands or restricts its benefits or excludes certain conditions

_____

[22] As Vanderbilt notes, similar references to "occupational disease" are not found in the 1985 Pacific policy form.

372 OCTOBER, 2019 333 Conn. 343

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

from coverage. . . . When properly incorporated into the policy, the policy and the rider or endorsement together constitute the contract of insurance, and are to be read together to determine the contract actually intended by the parties.'' (Internal quotation marks omitted.) *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, supra, 290 Conn. 806; see also, e.g., *Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, supra, 311 Conn. 55–56. If, however, ''the endorsement itself is clear and unambiguous, the content of the form policies themselves is irrelevant . . . because [e]ndorsement has also been defined generally to mean [a] written or printed form attached to the policy which alters provisions of the contract, and the word alter is synonymous with change.'' (Internal quotation marks omitted.) *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, supra, 806; see id., 806–807 (concluding that summary judgment was proper, even when insurer failed to supply policy provisions beyond clear and unambiguous endorsements, because ''[e]ven a policy provision that contradicts directly the terms of the endorsement is irrelevant to the disposition of the summary judgment motion''). Thus, even reading the Lloyd's provisions in harmony, the fact that the occupational disease exclusion lacks the language confining its application to Vanderbilt's employees, as found elsewhere in the Lloyd's policy, confirms further that such language was not intended to exist in the exclusion.

Although the occupational disease exclusion uses the term ''occupational disease'' broadly and without qualification, ''[t]he breadth of this exclusion does not render it any less clear and unambiguous . . . .'' Id., 800; see id., 799–800 (concluding that silicon exclusion defining '' 'silicon' '' as '' 'the mineral in any form,' '' excluded silicosis and silica related hazards that ''cannot exist in the absence of [the element] silicon''); *Peerless Ins. Co.* v. *Gonzalez*, 241 Conn. 476, 483, 697 A.2d 680 (1997)

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

("Because there is no requirement that a policy exclusion be cast in specific, rather than general, terms, the fact that the policy's lead exclusion contains no express reference to lead paint does not support [the insured's] contention that lead paint falls outside the purview of the exclusion. The relevant inquiry is not whether the policy issued by [the insurer] expressly excludes lead paint from its coverage but, rather, whether the language of the exclusionary provision nevertheless clearly and unambiguously applies to lead paint.").

We also acknowledge Vanderbilt's argument that the occupational disease exclusion should not be read in a way that renders the liability coverage provided by the policy meaningless. Although this argument is at first pass tempting, as noted by the Appellate Court; see *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, supra, 171 Conn. App. 258 n.92; Vanderbilt's argument is undercut by the stipulation between the parties that, for purposes of litigating the application of the occupational disease exclusion, (1) "[n]one of the plaintiffs in any of the underlying actions allege[s] that [he or she is] or ever [was a] Vanderbilt [employee]," and (2) "[t]he underlying actions can be classified into three categories, based on the alleged exposure of the underlying plaintiff to Vanderbilt products," specifically "Category A—alleged exposure is claimed solely through workplace exposure," "Category B—alleged exposure is claimed through a combination of workplace exposure and exposure outside of the workplace," and "Category C—alleged exposure is claimed solely through exposure outside of the workplace." The stipulation provides citations to multiple exemplar cases under each category. The existence of categories B and C indicates that the Appellate Court's reading of the plain language of the occupational disease exclusion does not completely vitiate the coverage provided by the policy. Indeed, even a significant exclusion limiting available coverage does not mean that the

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

insured did not get the coverage for which it bargained, or that the "insurance policies . . . are rendered meaningless by virtue of the denial of coverage . . . ." *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 270–71, 819 A.2d 773 (2003); see id. (no evidence that absolute pollution exclusion rendered policies "meaningless" given that they "provide coverage for a wide variety of accidents and mishaps . . . that may occur during [the plaintiff's routine business activities]" [internal quotation marks omitted]).

Finally, the case law cited by the parties, none of which interprets an occupational disease exclusion, simply bears out that an occupational disease may be compensable on the first-party basis by an affected employee's workers' compensation employer, *or* on a third-party basis by another tortfeasor—like Vanderbilt.[23] In particular, we disagree with Vanderbilt's reliance on the decision of the Maryland Court of Special Appeals in *Commercial Union Ins. Co.* v. *Porter Hayden Co.*, supra, 116 Md. App. 605, for the proposition that "the phrase 'occupational disease' cannot be interpreted outside of the employer-employee context without creating ambiguity." In that case, the court rejected an insurer's argument that a general liability policy that covered only " 'accidents' " did not cover claims of asbestos related diseases resulting from work-

_____

[23] Indeed, Connecticut's workers' compensation statutory scheme contemplates third parties being held liable in tort for injuries that are compensable under the act, including occupational diseases; see General Statutes § 31-275 (15); by providing an employer the right to intervene in an action brought by its employee against a third-party tortfeasor, in order to recover the benefits paid. See General Statutes § 31-293 (a); *Nichols* v. *Lighthouse Restaurant, Inc.*, 246 Conn. 156, 164–65, 716 A.2d 71 (1998). Put differently, the exclusivity of the workers' compensation remedy under statutes such as General Statutes § 31-284 is between the employee and the employer. See, e.g., *Hernandez* v. *Cavaliere Custom Homes, Inc.*, 511 F. Supp. 2d 221, 226 (D. Conn. 2007); *Mello* v. *Big Y Foods, Inc.*, 265 Conn. 21, 25–26, 826 A.2d 1117 (2003); *Ferryman* v. *Groton*, 212 Conn. 138, 146, 561 A.2d 432 (1989).

333 Conn. 343 OCTOBER, 2019 375

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

place exposure. Id., 697; see id., 701 (concluding that inhalation of asbestos fibers "is indisputably a personal bodily injury whether or not it is also an occupational disease," thus triggering coverage because, even "if 'occurrence' and 'accident' are not precise synonyms, they are nonetheless largely overlapping terms and they include 'continuous or repeated exposure to conditions which result in bodily injury' "). The Maryland court distinguished the insurer's reliance on cases that have "treated 'occupational diseases,' on the one hand, and 'personal bodily injuries caused by accident,' on the other hand, as mutually exclusive categories," as "taken from the very special and statutory world of [w]orkers' [c]ompensation law. It is a body of law that is not concerned with fault or liability coverage based on fault; it is concerned with whether certain forms of disability were [job related]. Although [job related] injury and [job related] disease are slowly evolving toward a single compensable phenomenon, their respective histories have been widely divergent. That divergence has produced a number of linguistic anomalies that are peculiar to [w]orkers' [c]ompensation law." Id., 697–98. We disagree with Vanderbilt's reliance on *Commercial Union Ins. Co.* because that case does not interpret an occupational disease exclusion or explain why commonly used definitions of the term "occupational disease" are inherently ambiguous. Indeed, the Maryland court emphasized that, "[e]ven if 'occupational disease' and 'personal bodily injury as a result of an accident' are mutually exclusive terms in [w]orkers' [c]ompensation law, that mutual exclusivity *by no means* carries over into general tort law."[24] (Emphasis added.) Id., 701.

[24] We also disagree with Vanderbilt's reliance on *Nolan* v. *Johns-Manville Asbestos & Magnesia Materials Co.*, supra, 74 Ill. App. 3d 778, for the proposition that "the phrase 'occupational disease' related only to workmen's compensation . . . ." In that product liability case, the court followed its workers' compensation case law and adopted the discovery rule to govern the running of the statute of limitations. Id., 788. Vanderbilt relies on the following observation in *Nolan*: "We are thoroughly cognizant of the distinctions between the present case and an occupational disease case seeking

376 OCTOBER, 2019 333 Conn. 343

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

Given the clear and unambiguous meaning of the term "occupational disease,"[25] we conclude that the Appellate Court properly construed the occupational

statutory compensation such as *Madison* [v. *Wedron Silica Co.*, 352 Ill. 60, 184 N.E. 901 (1933)]; however, the analysis drawn by the [Illinois Supreme Court] is useful in a case such as this, [in which] the disease of asbestosis according to expert testimony, can develop over a period of ten to twenty-five years, even though the action pursued here is for [product] liability rather than workmen's compensation." *Nolan* v. *Johns-Manville Asbestos & Magnesia Materials Co.*, supra, 788. Again, nothing in the cited portions of *Nolan* supports the proposition that occupational disease is a concept that is linguistically meaningless beyond the workers' compensation context; instead, they support the opposite proposition, namely, that the term has applicability in a variety of legal settings. Nor does *Nolan* describe specifically *any* applicable "distinctions" between workers' compensation and the common law.

We similarly disagree with Vanderbilt's reliance on *Ins. Co. of North America* v. *Forty-Eight Insulations, Inc.*, supra, 451 F. Supp. 1230. In that insurance coverage case, the court declined to apply a manifestation trigger for the underlying product liability claim, deeming the common-law contracts principles distinguishable from the statutory "last employer" rule that governs coverage for workers' compensation claims. Id., 1240–41. Again, this case does nothing to elucidate the meaning of the occupational disease exclusion, with the court's failure to refer to the underlying claims as "occupational diseases" both unexplained, and in our view, purely incidental. Similarly, the court does not state in any way that occupational disease is a phrase with a distinct meaning in the context of workers' compensation, as opposed to the common law.

The cases cited by National Casualty similarly do not interpret an occupational disease exclusion, and stand only for the proposition that a claim arising from an occupational disease may exist independently of a workers' compensation claim. See *TKK USA, Inc.* v. *Safety National Casualty Corp.*, supra, 727 F.3d 788–90 (common-law claim against employer for negligence is covered under employer's liability coverage, even if underlying claim is statutorily barred by state occupational disease compensation statute, because of gaps in statute, and "covered loss" would include defense of even groundless claim); *Rodriguez* v. *E.D. Construction, Inc.*, supra, 126 Conn. App. 728 (independent contractor was excluded from participation in workers' compensation system); *Wyness* v. *Armstrong World Industries, Inc.*, supra, 171 Ill. App. 3d 677 (surviving spouse of insulator who died from asbestos related lung cancer brought wrongful death action against manufacturers of insulation); *Tooey* v. *AK Steel Corp.*, supra, 623 Pa. 82 (exclusivity provision of workers' compensation act did not bar common-law action by employee against employer when occupational disease claim manifested beyond act's limitation period); *United National Ins. Co.* v. *J.H. France Refractories Co.*, supra, 36 Pa. D. & C.4th 409–10 (manufacturer fraudulently procured commercial general liability insurance despite knowledge of pending third-party product liability claims against it arising from asbestosis injuries).

[25] Vanderbilt's criticism of the Appellate Court's reliance on two law review articles and an American Bar Association report to elucidate the apparent

R.T. Vanderbilt Co., Inc. *v.* Hartford Accident & Indemnity Co.

disease exclusions to "bar coverage for occupational disease claims brought not only by employees of Vanderbilt but also by individuals who contracted an occupational disease in the course of their work for other employers." *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, supra, 171 Conn. App. 269–70. The Appellate Court, therefore, properly reversed the decision of the trial court, which had adopted a reading of the occupational disease exclusions to the contrary.[26]

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

---

purpose of the occupational disease exclusions, as well as the apparent "mutual understanding" of the parties with respect to the policies at issue, is, however, well taken. See *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, supra, 171 Conn. App. 264 and n.95, citing W. Viscusi, "Structuring an Effective Occupational Disease Policy: Victim Compensation and Risk Regulation," 2 Yale J. on Reg. 53, 65 (1984); Note, "Compensating Victims of Occupational Disease," 93 Harv. L. Rev. 916, 926 (1980); American Bar Association, ABA Blueprint for Improving the Civil Justice System: Report of the ABA Working Group on Civil Justice System Proposals (1992) p. 53. As Vanderbilt notes, the law review articles both were published after the Lloyd's policy was issued, and the American Bar Association report was published after both policies were issued, and, thus, neither could have had affected the parties' intent. Moreover, given the plain and unambiguous language of the occupational disease exclusions, it simply was unnecessary to consider "legal scholarship from that era" in support of the conclusion that "the insurance industry was concerned over the emerging proliferation of private litigation by workers who, having developed long latency diseases after exposure to asbestos and other alleged industrial toxins, sought to circumvent the workers' compensation system and sue manufacturers of those products." *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, supra, 265–66. Indeed, this extratextual focus on the intent of the insurers runs counter to our well established approach of interpreting insurance policies, which focuses on how the language would be viewed by the layman, or policyholder. See, e.g., *Nationwide Mutual Ins. Co.* v. *Pasiak*, supra, 327 Conn. 238–39.

[26] As Vanderbilt acknowledges, whether the insurers waived their right to invoke the occupational disease exclusions via a reservation of rights or failing to plead it as a special defense in this action is a question reserved for the next phase of this complex litigation. Accordingly, we agree with the Appellate Court's direction to the trial court to "consider Vanderbilt's alternative argument that certain defendants are precluded from invoking the exclusions because they failed to timely plead the exclusions as a special defense." *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity. Co.*, supra, 171 Conn. App. 270.